**ADVANCED MARINE TECHNOLOGIES, INC., Plaintiff,**

v.

**BURNHAM SECURITIES, INC., et al., Defendants.**

No. 97 Civ. 7004(LAK).

United States District Court, S.D. New York.

Aug. 7, 1998.

Alexander Berkovich, Berkovich and McMenamin, New York City, for Plaintiff.

Henry P. Wasserstein, Skadden, Arps, Slate, Meagher & Flom, New York City, for Defendant Burnham Securities, Inc.

Michael W. Mitchell, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for Defendant A. Michael Victory.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Advanced Marine Technologies, Inc. ("AMT") claims that defendant Burnham Securities, Inc. ("Burnham"), through its officer, A. Michael Victory, agreed to obtain financing for AMT and then failed to perform. It seeks to recover damages on theories of breach of contract, fraud, promissory estoppel, and negligence, among others. Burnham and Victory seek dismissal of the complaint on the grounds that there never was any contract between AMT and Burn-

ham, that there is no basis for a fraud claim, and that the complaint fails to make out the elements of the other causes of action.

## Facts

█ As the matter is before the Court on a motion to dismiss the amended complaint, the allegations of that pleading and all inferences that reasonably may be drawn therefrom are assumed true save in one particular. Paragraph 61 of the amended complaint refers to and quotes much of Victory's letter, dated July 8, 1997, to AMT. As plaintiff thus has incorporated the letter by reference into the complaint, the Court considers the entire letter under the settled law of this Circuit.[1]

In May 1997, AMT, which is engaged in the development of marine propulsion technology, was in financial difficulty.[2] During that month, it met with Burnham's Victory and discussed the possibility of Burnham acting as AMT's investment bank.[3] A second meeting was held later in the month at which AMT presented its technology to a number of Burnham officials in addition to Victory.[4] Plaintiff alleges, on information and belief, that Burnham held a meeting shortly after May 29 at which it decided that "it was not capable of, nor interested in raising funds for AMT on a best efforts basis" and so advised Victory.[5] Nevertheless, AMT alleges that Burnham advised Victory that he was free to pursue financing for Burnham on his own.[6]

Discussions between Victory and AMT continued. On June 2, 1997, according to AMT, Victory told it that Burnham was interested in and capable of raising $6 to $7 million for AMT.[7] On June 30, 1997, AMT met with Victory and another Burnham representative. Victory told them that Burn-

ham would commit to raising the money provided AMT could raise $250,000 to stabilize its operations for 90 to 120 days.[8] He supposedly said also that AMT would receive an engagement letter from Burnham later that day.[9]

During the month of June, AMT was in discussions also with another potential source of funds. Investec, which on June 26 proposed to raise more than $8 million for AMT.[10] When AMT disclosed the Investec discussions to Victory, however, Victory allegedly advised that Investec's terms to AMT were more expensive than those that Burnham would require.[11] In consequence, AMT on July 8, 1997 allegedly told Investec that it would work with Burnham in raising financing, although it held out the possibility that Investec might play a role in providing some interim financing.[12]

It was at this point that Victory wrote AMT the letter referred to in the opening paragraph of this section, which is quoted selectively in the amended complaint for rather obvious reasons. The letter reads in full as follows, with the critical portion omitted by plaintiff rendered in italics:

"We very much enjoyed our conversations yesterday, and your update on the encouraging developments at AMT. At your request, I have summarized below Burnham Securities' current attitude with respect to establishing a possible investment banking relationship with your company.

"Based on our preliminary due diligence, we are impressed with AMT's product line and its market potential, as well as the commitment of your current management team. As a result, we are preparing a

---

1. *E.g., Harsco Corp. v. Segui,* 91 F.3d 337, 341 n. 1 (2d Cir.1996); *San Leandro Emer. Med. Group Profit Sharing Plan v. Philip Morris Companies,* 75 F.3d 801, 808 (2d Cir.1996); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991).

2. *See* Am. Cpt. ¶¶ 23–26.

3 *Id.* ¶¶ 27–29.

4. *Id.* ¶¶ 30–31.

5. *Id.* ¶¶ 32–33.

6. *Id.* ¶ 34.

7. *Id.* ¶¶ 35–36.

8. *Id.* ¶¶ 39–40.

9. *Id.* ¶ 42.

10. *Id.* ¶¶ 43–46.

11. *Id.* ¶¶ 47–50.

12. *Id.* ¶¶ 51–56.

proposed Engagement Letter which will be available by the end of this week, subject to the matters discussed below.

"The engagement letter will propose that Burnham Securities will, on a best efforts basis, attempt to raise up to $6,000,000 for the company (or such other amount as may be mutually agreed upon). Such engagement will be contingent upon the company raising not less than $250,000 in interim 'bridge' financing and the absence of any materially adverse finding (as determined solely by Burnham) which might arise from the completion of our due diligence. It will also contain other provisions (such as indemnification) as is typical of such agreements. Finally, the letter will outline Burnham's compensation, which we have briefly discussed but not yet agreed upon. The compensation will involve an upfront retainer, a success fee payable in cash at the closing, and warrants to purchase shares of AMT in the future.

"Stefan, *I emphasize that this letter is not an agreement on the part of Burnham to move forward with the financing, which will result only from the execution of a mutually acceptable engagement letter.*

"We look forward to working with you in the future and hope we can play a role in your success." [13]

Two days later, AMT and Victory met with Investec to discuss Investec's role in raising financing. Investec expressed willingness to continue, presumably on the limited basis that had been indicated. Victory indicated that (i) he and Burnham had contacted prospective investors, who were "universally positive," (ii) there was no conflict of interest between Burnham and Investec, (iii) Burnham would commit to raising $5 to $7 million for AMT, although it would take 90 to 120 days to do so, (iv) Burnham would lead the underwriting and prepare the offering mate-

rials, and (v) Burnham would place a representative on AMT's board.[14] Following the July 10 meeting, however, Victory allegedly told AMT that Investec's terms were "too 'avarice'" [*sic*] and recommended against working with Investec at all.[15] AMT therefore informed Investec that it would not engage its services.[16]

July found AMT in discussions with the Binch Group, another prospective investor. Victory and AMT met with Binch on July 14, 1997, on which occasion Victory allegedly repeated substantially the same comments made at the July 10 meeting with Investec. In addition, he is said to have stated that Burnham would (i) waive its retainer fee, (ii) take 7.5 percent in cash and an option to buy 7.5 percent of AMT's equity at the offering price, and (iii) furnish an engagement letter on the following day. In addition, Victory is said to have stated that "the engagement letter was just a formality." [17]

As promising as things may have looked, they quickly unraveled. On or about July 18, 1997, a Burnham representative called AMT and advised its chief executive that no engagement letter would be forthcoming, that it was very embarrassed by Victory's conduct, and that Victory was suffering from a substance abuse problem.[18] In subsequent discussions between Burnham representatives and AMT, Burnham stated that Victory had been a recovering alcoholic for over six years, that Burnham had not authorized his actions with respect to AMT, that it nevertheless had given its "blessings with respect to AMT so long as Victory could make it a success," and that Burnham would not commit to raise financing for AMT.[19]

Plaintiff makes a number of allegations with respect to Burnham's alleged awareness of Victory's alleged alcohol problem. It claims that Burnham employees detected the odor of alcohol in Victory's office and on his breath during working hours.[20] It alleges

---

13. Pl. Mem. Ex. A (emphasis supplied).

14. Am. Cpt. ¶ 64.

15. *Id.* ¶ 57.

16. *Id.* ¶ 58.

17. *Id.* ¶ 68.

18. *Id.* ¶¶ 71–74.

19. *Id.* ¶¶ 76–80.

20. *Id.* ¶¶ 82–83.

also that Burnham had "actual knowledge" that Victory was drinking excessively during the relevant period.[21] On the other hand, it alleges as well that Victory prevented one Chauvet, a Burnham employee who was involved in Victory's initial discussions with AMT, from continuing to work on the transaction "so that he could without any witnesses continue drinking excessively during the negotiations with AMT."[22] The complaint is curiously silent as to whether AMT perceived Victory's allegedly obvious alcohol problem.

According to the complaint, Burnham fired Victory on or about July 18, 1997. Victory subsequently committed himself to a substance abuse program.

### Discussion

#### The Contract Claim

■ The first and eighth causes of action sound in contract, the first alleging breach of the supposed contract by which Burnham undertook to raise financing for AMT and the eighth breach of the duty of good faith and fair dealing implied therein. Plaintiff's basic problem is that there was no contract.

■ Absent a mutual intention to be bound, there can be no contract. In this case, Victory's July 8, 1997, letter, in the portion misleadingly omitted by AMT,[23] unequivocally stated an intention that Burnham undertake no legally enforceable obligation absent the execution of a mutually acceptable written agreement. In the circumstances of this case, that is dispositive.

■ To be sure, oral contracts occupy a venerable position in our jurisprudence.

When not barred by the statute of frauds, they are just as binding as written contracts. But the ultimate question is whether there was an oral contract—that is, whether the parties intended their conversations and oral statements to result in legally binding obligations. Moreover, just as parties must retain the freedom to enter into oral contracts, "[f]reedom to avoid oral agreements is especially important when business entrepreneurs and corporations engage in substantial and complex dealings. . . . The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing."[24]

■ Where, as here, the issue turns on whether parties intended to be bound, courts look to four factors to inform the decision. The most important is whether a party made an express reservation of the right not to be bound in the absence of a signed writing. Others are (1) whether there has been partial performance, accepted by the party disclaiming the contract, (2) whether all of the terms of the alleged contract have been agreed upon, and (3) whether the agreement is the type of contract that usually is committed to writing.[25]

■ Here these factors leave no room for doubt. Victory, purportedly speaking for Burnham, expressly stated that Burnham would not be bound absent a signed contract. As the July 8 letter stated, at least one pivotal term of the agreement—Burnham's compensation—had not been agreed upon.[26] There was no part performance, as there is

**21.** *Id.* ¶ 80.

**22.** *Id.* ¶ 81.

**23.** It is difficult to see what counsel hoped to accomplish by omitting the critical language. Simple courtesy, not to mention counsel's duty of candor, required its inclusion.

**24.** *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir.1984).

**25.** *Id.* at 75–76. *Accord, Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir.1993); *Winston*

*v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985).

**26.** AMT argues that the parties resolved the compensation issue at the July 14 meeting and contends further that the agreement on all substantial terms allegedly reached on that occasion created a binding contract despite an intention to memorialize the agreement in a later writing. (Pl. Mem. 13) But AMT is mistaken, even assuming that the allegations concerning the July 14 meeting were read as meaning that the parties then agreed on all aspects of the compensation issue. While AMT surely is correct that parties *may* intend to be bound despite an intention later

no allegation that Burnham did anything that was referable uniquely to the alleged contract, much less any part performance by AMT that was accepted by Burnham. And this—an investment banker's engagement with respect to the raising of capital—quite clearly is the type of agreement invariably (or at least customarily) committed to writing.

As the facts alleged in the complaint and the inferences that reasonably might be drawn therefrom would not permit a trier of fact to conclude, in light of the full text of the July 8, 1997 letter, that the parties entered into a legally binding agreement, the first and eighth causes of action are dismissed. AMT's contention that summary judgment and, by parity of reasoning, dismissal on the pleadings, are inappropriate as a matter of law whenever intent to be bound is in question simply is incorrect.[27]

*Promissory Estoppel*

■ AMT's second cause of action contends that the same promises allegedly con-

stituting Burnham's contract to raise financing, coupled with its own reliance, bind the defendants on a theory of promissory estoppel. The argument, however, is baseless.

■ The parties agree that the elements of promissory estoppel under New York law are a clear and unambiguous promise, reasonable and foreseeable reliance, and resulting injury.[28] And AMT's claim fails essentially for the same reason as its contract claim. Victory and, to the extent that he spoke for it, Burnham made it unmistakably clear that any obligation to proceed was conditional upon the execution of a written contract. As the Court of Appeals made plain in *R.G. Group, Inc.*, plaintiff manifestly cannot make an end run around Burnham's reservation against undertaking any legal obligation absent a signed contract by recharacterizing the contract claim as one of promissory estoppel.[29] Indeed, Section 91 of the contracts Restatement qualifies the doctrine of promis-

to reduce an oral agreement to writing, *e.g.*, *Consarc Corp.*, 996 F.2d at 574, it is equally true that oral agreement on all material terms of a proposed contract results in no legally enforceable obligations where, as here, the parties clearly evidence an intention not to be bound absent execution of a mutually acceptable written agreement. *E.g.*, *R.G. Group, Inc.*, 751 F.2d at 74; *see Consarc Corp.*, 996 F.2d at 574.

27. *R.G. Group, Inc.*, 751 F.2d at 77 (affirming summary judgment where defendant stated that no contract would exist until contract documents executed); *Silverite Constr. Co. v. Montefiore Med. Ctr.*, 239 A.D.2d 336, 657 N.Y.S.2d 196 (2d Dept.1997) (same); *Oursler v. Women's Interart Ctr., Inc.*, 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (1st Dept.1991) (reversing denial of summary judgment for party disclaiming contract where parties had agreed that there would be no contract absent writing signed by both); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (acknowledging propriety of summary judgment on the issue of actual malice on an appropriate record). There is language in *Consarc* suggesting that summary judgment never may be granted on the issue of intention to be bound, a suggestion for which it cites *Babdo Sales, Inc. v. Miller–Wohl Co.*, 440 F.2d 962, 965 (2d Cir.1971). *Consarc Corp.*, 996 F.2d at 576. But the case is not properly so construed. In any case, the comment is dictum.
To begin with, the Second Circuit, as indicated, affirmed the grant of summary judgment on precisely this issue in *R.G. Group, Inc.*, 751 F.2d at

77, a case cited with approval in *Consarc*. Second, *Babdo Sales*, although it indicates that trials frequently will be required on the issue of intention, does not proscribe summary judgment in such cases where the record supports that relief. To the contrary, it quotes approvingly from COR-BIN ON CONTRACTS to the effect that the question of intention to be bound "may properly be left to a jury" in "very many cases," 440 F.2d at 965, thus of course implying that the issue properly is taken from a jury in others. Moreover, *Babdo Sales*, and *Consarc's* gloss upon it, must be read in light of the facts of those cases. In sharp contrast to this case, there was no express reservation against any legal obligation absent a signed written contract in either *Babdo Sales* or *Consarc*. Indeed, in *Consarc*, there was conflicting testimony as to whether the party resisting the claim had made an oral statement to the effect that there would be no legal obligation absent a written contract. 996 F.2d at 576. In view of all of these considerations, the proper reading of the language in *Consarc* is simply that courts must be cautious in granting summary judgment, perhaps especially so where the issue is intent, but that summary judgment nevertheless may be appropriate in such a case if there is no genuine issue of material fact for trial.

28. *E.g.*, *R.G. Group, Inc.*, 751 F.2d at 78; RE-STATEMENT (SECOND) OF CONTRACTS § 90 (1981).

29. 751 F.2d at 79 (rejecting promissory estoppel claim where alleged promisor indicated agreement conditioned on signing of written contract).

sory estoppel by stating that performance of a conditional promise comes due under Section 90 only if the condition has been satisfied,[30] which concededly did not occur here. Thus, no matter how one views the question, there is no basis here for a claim of promissory estoppel.

*Fraud*

The third and fourth causes of action purport to assert claims for fraud. The third contends that AMT was induced by the allegedly fraudulent conduct to enter into commitments to the defendants and to forego other opportunities. The fourth is identical save that its scope is limited to the allegedly foregone opportunities. Both rest on identical allegations, all made on information and belief, that Victory knew that Burnham had neither interest in conducting nor the ability to conduct the financing that he said it would conduct and that it had no intention of doing so.[31]

### Legal Sufficiency

Defendants first argue that the fraud claims are insufficient as a matter of law on the theory that AMT in substance claims only that Burnham did not intend to perform its obligations under the alleged contract and that AMT has not pleaded the added element of a fraud claim in such circumstances—(i) a legal duty separate from the duty to perform under the contract, (ii) a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) special damages caused by the misrepresentation and unrecoverable as contract damages.[32] AMT rejoins that the defendants' representations that Burnham was interested in and capable of raising $6 to $7 million, that it would commit to doing so if AMT raised $250,000 in short term financing, that an engagement letter would be available by the end of the week of July 8, that Victory had spoken to other companies who were "universally positive" about investing in AMT, that Burnham would provide an engagement letter, and that the engagement letter was being reviewed in Burnham's legal department were the sort of extraneous misrepresentations that come within *Bridgestone*.[33] It argues also that the loss of the opportunity to raise over $6 million through Investec constitutes special damages.

The alleged representations that Burnham was interested in and capable of raising the money, that it would do so if AMT raised $250,000 in bridge financing, and that it was about to sign the engagement letter in substance are nothing more than an assertion that Burnham promised to do the financing when in fact it had no intention of living up to its alleged contractual obligation. It "merely appends allegations about [defendant's] state of mind to the claim for breach of contract." [34] It "alleges only a breach of the representation of performance implicit in making" the alleged contractual commitment.[35] It therefore does not come within *Bridgestone*.

■ The remaining alleged misrepresentation—that Victory falsely stated that he had "uniformly positive" investors waiting in the wings—presents a closer question which is illuminated by the circumstances in which it is said to have been made. The representation allegedly occurred in the context of AMT's consideration of the Investec propos-

---

*Accord, Villeroy & Boch S.a.r.l. v. THC Sys., Inc.,* No. 84 Civ. 8073(BN), 1991 WL 102520, at *8 (S.D.N.Y. June 3, 1991) (rejecting promissory estoppel argument where defendant expressly stated that it would not be bound sent a signed agreement on the ground that "there simply was no 'clear and unambiguous promise' "); *Prestige Foods, Inc. v. Whale Sec. Co.,* 243 A.D.2d 281, 663 N.Y.S.2d 14, 15 (1st Dept.1997).

**30.** RESTATEMENT (SECOND) OF CONTRACTS § 91 (1981).

**31.** *See* Am. Cpt. ¶¶ 32–33, 96–101, 107–110.

**32.** *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996). The *Bridgestone* test must be satisfied in such cases even where the conventional elements of common law fraud are made out. *Id.* at 19–20.

**33.** Pl. Mem. 22–24.

**34.** *Bridgestone,* 98 F.3d at 20 (quoting *Papa's–June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1162 (S.D.N.Y.1996)).

**35.** *Met. Transp. Auth. v. Triumph Adv. Prods. Inc.,* 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dept.1986) (quoted with approval in *Bridgestone,* 98 F.3d at 20).

al. Although it certainly related to Burnham's alleged promise to do the financing, it must be borne in mind that the proposal under discussion with Burnham was for a "best efforts" engagement—i.e., an engagement in which Burnham would commit only to using its best efforts to raise the money AMT needed, not to furnishing the cash "come hell or high water." Thus, the representation at issue went beyond a statement that the defendants would use their best efforts to raise the money. It was a purported statement of fact suggesting that Burnham's "best efforts" were likely to succeed—certainly an inducement to stick with Burnham. Hence, at least at this pleading stage, the Court holds that this alleged misrepresentation was sufficiently collateral to the alleged contract to satisfy *Bridgestone.*

 There remains the question whether any of the alleged misrepresentations which the Court has held to be integral to the contract claim nevertheless is actionable on the theory that plaintiff has alleged special damages unrecoverable on a contract theory, which is an alternative route articulated in *Bridgestone.*[36] In this context, "special damages" refers to the difference between the measures of damages recoverable for breach of contract and for fraud.[37] In contract cases, the prevailing plaintiff is entitled to damages giving the economic equivalent of the benefit of the bargain whereas the measure of damages for fraudulent inducement is "indemnity for [the] loss suffered through that inducement."[38] Hence, the issue is whether plaintiff adequately has pleaded damages recoverable under the more restrictive indemnity measure.

The third cause of action complains both that AMT was induced to enter into commitments with Burnham and that it lost other opportunities while the fourth is restricted to the latter theory. It alleges on each that it has been injured in the amount of $6,250,000

without any elaboration of the basis for that assertion. As Rule 9(g) requires that special damages be pleaded specifically, these claims are not saved by *Bridgestone*'s special damages prong.

*Rule 9(b)*

The defendants argue, in the alternative, that plaintiff has failed to plead fraud with the particularity required by Rule 9(b) in that it has failed adequately to plead *scienter.* In view of the rulings in the preceding section, this alternative argument remains material only as to the contention that Victory defrauded AMT by falsely stating that he had spoken to other companies and that they were "universally positive" about investing in AMT.

 Plaintiffs alleging fraud must "provide some factual basis for conclusory allegations of intent. These factual allegations must give rise to a 'strong inference' that the defendants possessed the requisite fraudulent intent. A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[39]

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[40] Moreover, allegations made on information and belief are insufficient unless the facts are peculiarly within the knowledge of the defendant, and even in such cases facts setting forth a suffi-

---

**36.** 98 F.3d at 20.

**37.** *See Deerfield Communications Corp. v. Cheseborough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986).

**38.** *Id.* (quoting *Sager v. Friedman,* 270 N.Y. 472, 481, 1 N.E.2d 971 (1936)).

**39.** *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988) (citations omitted).

**40.** *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir., 1994).

cient basis for the inference of fraud must be alleged.[41]

The allegation that Victory's alleged representation concerning other investors was false is made on information and belief. While no facts are alleged that directly go to the question whether he had spoken to other companies about investing in AMT and, if so, whether those other companies were positive, there are other indications in the complaint that tend to support AMT on that score. Victory's statement allegedly was made in circumstances in which he had an incentive to keep AMT "sweet" in the hope of pulling a deal together. AMT has alleged that Burnham's senior managing director on July 21, 1997 told it that Burnham had a problem with Victory, that it could not reach him, that Victory had a substance abuse problem, and that he had acted without Burnham's authority, although the statement on the latter point was somewhat equivocal.[42] And it seems unlikely that Burnham would have walked away from the situation if in fact Victory had lined up "positive" investors. Accordingly, the Court holds that plaintiff has pled sufficient facts "on knowledge" to justify its allegation, on information and belief, that the representation was false. And this conclusion is dispositive on the issue of *scienter* as well, given the nature of the alleged misrepresentation. If there is sufficient basis for concluding that Victory's representation that he had spoken to other companies and that they were positive was false, then there is sufficient basis for concluding that he knew that the representation was false.

### Summary as to Fraud Claims

The fourth cause of action is entirely duplicated in the somewhat broader third cause of action and therefore is surplus. The third cause of action fails to state a claim upon which relief may be granted except insofar as it alleges fraud based on Victory's alleged statement that he had spoken to other companies about investing in AMT and that they were "universally positive." While that failure to plead special damages with respect to the other alleged representations in theory might be cured by amendment, plaintiff already has amended once and has not sought leave to amend again. Accordingly, the fraud claims will be dismissed except to the limited extend indicated.

### Negligence

The fifth cause of action, which is captioned "negligence," alleges that "[d]efendants' conduct in breaching and failing to perform their legal duties and obligations . . . has caused and continues to cause injury and damages to AMT."[43] Apart from the use of the word in the title of the cause of action, the word "negligence" does not appear in the claim. No legal duty is set forth apart from the duties assumed by virtue of the alleged contract. No breach of duty is alleged apart from the alleged breach of the contract.[44] Accordingly, the fifth cause of action fails to state a claim upon which relief may be granted.[45]

### Failure to Supervise

The sixth cause of action, which is styled "failure to supervise," alleges in substance that Burnham knew that Victory had a substance abuse problem but negligently failed to supervise him, resulting in damage to the plaintiff.[46] Burnham contends that the claim is insufficient because it alleges nothing more than breach of the alleged contract.

**41.** *E.g., Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997); *Luce v. Edelstein,* 802 F.2d 49, 54 n. 1 (2d Cir.1986); *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972).

**42.** Am. Cpt. ¶ 76.

**43.** Am. Cpt. ¶ 121.

**44.** AMT's memorandum refers to the allegations that Victory told AMT that the Investec proposal was "too expensive" and Investec "too avarice"

[*sic* ]. (Pl. Mem. 30) Presumably counsel did so with a professional malpractice theory in mind. Nowhere, however, does the amended complaint suggest that this advice was rendered without due care or otherwise in breach of the applicable standard of professional practice.

**45.** *E.g., Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).

**46.** Am. Cpt. ¶¶ 123–29.

It is important to clear away at the outset one bit of otherwise possibly confusing underbrush. Section 15(b) of the Securities Exchange Act of 1934 [47] permits the Securities and Exchange Commission to discipline persons associated with broker-dealers who fail reasonably to supervise those subject to their supervision. "Failure to supervise" is a phrase referring to such claims, and a considerable body of jurisprudence has developed concerning this aspect of Section 15(b). [48] As plaintiff does not purport to sue under that statute, however, it is entirely immaterial here except to the extent, if any, that SEC concepts of supervision might inform the determination of the content of any legal duty owed by Burnham to AMT as a matter of the common law of New York.

■ Generally speaking, an employer is liable for the torts of its employees committed within the scope of their employment. [49] The scope of employment frequently is capacious, and the rule has been expanded in some circumstances to permit liability even for purely personal torts of employees, where the employer has entered into a relationship making it responsible for the protection of the plaintiff. [50] Moreover, there are some circumstances in which a principal may be found liable for negligent supervision of an agent. [51]

In these circumstances, it is entirely likely that the legal sufficiency of the sixth cause of action is academic. Nevertheless, that cannot now be said with assurance, as Victory may have acted outside the scope of his employment. Nor may the Court conclude now that plaintiff can prove no facts under this complaint that would give rise to a duty on Burnham's part to protect the plaintiff, thus perhaps rendering it liable even for a purely personal tort by Victory. Hence, given the liberal standards applicable to the constructing of pleadings for Rule 12(b)(6) purposes, it cannot now be said that plaintiff can prove no facts that would permit a recovery against Burnham for which Burnham would not be liable on the basis of *respondeat superior.* Accordingly, the motion to dismiss the sixth cause of action is denied.

*Interference With Prospective Contractual Relationship*

■ The ninth cause of action alleges that defendants tortiously interfered with AMT's prospective relationship with Investec by means of the fraudulent representations described elsewhere in the amended complaint.

■ In order to recover for tortious interference with business relations, a plaintiff must allege that the defendant (1) interfered with those relations, (2) either (a) with the sole purpose of harming plaintiff or (b) by means that were dishonest, unfair or improper. [52] Here, there is no suggestion that defendants acted with the sole purpose of harming plaintiff. Hence, the issues are whether they interfered with the Investec relationship and, if so, whether they did so by fraudulent or Improper means.

■ Here, there is no suggestion that the defendants had any direct contact with Investec that had either the purpose or effect of causing Investec not to do business with AMT. To the contrary, in the only contact between Victory and Investec referred to in the complaint, a contact that took place after AMT had told Investec that it would look to Burnham to raise long term capital but that there might be a role for Investec with respect to interim financing, Victory allegedly stated that there was no conflict between

---

**47.** 15 U.S.C. § 780(b).

**48.** *See, e.g., John H. Gutfreund,* Exch. Act Rel. No. 31554, 52 SEC Docket 2849 (Dec. 3, 1992); *First Albany Corp.,* Exch. Act Rel. No. 30515, 51 SEC Docket 87 (Mar. 25, 1992); *Broker–Dealer Failure to Supervise: Determining Who is a "Supervisor,"* Remarks of Commissioner Mary L. Schapiro, SIA Compliance and Legal Seminar, Mar. 24, 1993.

**49.** *E.g., Cornell v. State,* 46 N.Y.2d 1032, 1033, 416 N.Y.S.2d 542, 543, 389 N.E.2d 1064 (1979).

**50.** *Id.;* 5 Fowler v. Harper, Fleming James, Jr., & Oscar S. Gray, The Law of Torts § 26.9, at 53–54 (2d ed.1986).

**51.** Restatement (Second) of Agency § 213 (1958).

**52.** *E.g., Golden Gulf Corp. v. Jordache Enter., Inc.,* 896 F.Supp. 337, 340 (S.D.N.Y.1995)

Burnham and Investec.[53] The lack of a deal with Investec, according to AMT, thus was the product of AMT's subsequent decision—to be sure, a decision allegedly influenced by Victory—not to engage Investec,[54] not anything that Victory said to Investec. Since a tortious interference plaintiff must demonstrate that the defendant "intentionally caused the [third party] not to enter into a contractual relationship with" the plaintiff,[55] the ninth cause of action fails to state a claim upon which relief may be granted.

### Conclusion

 The preceding discussion addresses the legal sufficiency of each of the causes pleaded in the amended complaint save the seventh, which seeks to recover alleged losses of business, profit and goodwill as foreseeable consequences of the actions of defendants alleged elsewhere in the complaint.[56] To the extent that such damages are recoverable on other claims, they may be recovered without pleading them as a separate cause of action. Pleaded as a separate cause of action, they are insufficient and unnecessary.

For the foregoing reasons, defendants' motion to dismiss the amended complaint is granted in all respects save that the motion is denied with respect to the sixth cause of action and so much of the third cause of action as alleges that defendants defrauded plaintiff by falsely representing that Victory had discussed investment in AMT with other companies and that those companies were "universally positive."

SO ORDERED.

---

**53.** Am. Cpt. ¶¶ 51–57, 64.

**54.** *Id.* ¶¶ 57–58.

**55.** *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 768 (2d Cir.1995); *see also Marilyn Miglin,* *Inc. v. Gottex Indus., Inc.,* 790 F.Supp. 1245, 1254 (S.D.N.Y.1992).

**56.** Am. Cpt. ¶¶ 130–33.