HALLWOOD REALTY PARTNERS,
L.P., Plaintiff,

v.

GOTHAM PARTNERS, L.P.,
et al., Defendants.

No. 00 CIV. 1115(LAK).

United States District Court,
S.D. New York.

May 2, 2000.

Thomas J. McCormack, Beth D. Diamond, Maura K. Tully, Tami S. Stark, Chadbourne & Parke LLP, New York City, for Plaintiff.

Philip H. Schaeffer, J. Christopher Shore, White & Case LLP, New York City, for Defendants Gotham Partners, L.P. and Gotham Partners III, L.P.

Robert J. Giuffra, Jr., Sullivan & Cromwell, New York City, for Defendants Interstate Properties and Steven Roth.

Ronald H. Alenstein, D'Amato & Lynch, New York City, Joseph K. Hegedus, Lewis, D'Amato, Brisbois & Bisgaard LLP, Los Angeles, CA, for Defendant Private Management Group, Inc.

Gregory J. Joseph, Albert Shemmy Mishaan, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendant EFO Realty, Inc.

## OPINION

KAPLAN, District Judge.

Battles for corporate control during the 1970's and '80's frequently included lawsuits by takeover targets claiming that potential aggressors had violated Section 13(d) of the Securities Exchange Act of 1934[1] (the "Exchange Act") by failing ac-

---

1. 15 U.S.C. § 78m(d).

curately to disclose the motives for their purchases of the targets' shares and the membership of alleged groups of allies working together to achieve the common goal of taking over the target. For reasons that need not be detailed here, such actions have become rare. But this case brings to mind Yogi Berra's immortal line, "This is *deja vu* all over again."

Here, plaintiff Hallwood Realty Partners, L.P. ("Hallwood"), a publicly traded real estate investment trust, charges that defendants Gotham Partners, L.P. and Gotham Partners III, L.P. (collectively, "Gotham") have acquired a 14.82 percent interest in Hallwood pursuant to a plan to take control of and fundamentally change or liquidate Hallwood, that the defendants together hold about 40 percent of Hallwood and are acting secretly as a group to accomplish this end, and that all of the defendants have violated Section 13(d) in a variety of respects. They claim also that defendants have triggered Hallwood's "poison pill" and seek declaratory relief as well as a broad injunction requiring defendants to, *inter alia*, divest their Hallwood units and make corrective disclosures. The matter is before the Court on motions to dismiss the complaint and for other relief.[2]

*Facts*

*Parties*

Hallwood is a limited partnership that acquires, owns and operates commercial real estate in the United States. Its units are traded on the American Stock Exchange

Defendants Gotham Partners, L.P. and Gotham Partners III, L.P. both are limited partnerships based in New York. Defendants Private Management Group, Inc. ("PMG") and EFO Realty, Inc. ("EFO")

are California and Texas corporations, respectively. Gotham, PMG and EFO all are investment companies that invest in real estate-related businesses. Defendant Interstate Properties is a New Jersey-based general partnership of which defendant Stephen Roth is a general partner. It is in the real estate business.

*Gotham's Purchases of Hallwood Units and the Delaware Litigation*

Gotham began purchasing Hallwood units in the open market in or about 1995. In December 1995, after accumulating more than 5 percent of the outstanding units, it filed a Schedule 13D with the Securities and Exchange Commission (the "SEC") in which it stated that it had acquired the units "for investment purposes." It continued buying and amending its Schedule 13D over the ensuing ten months, amassing 14.82 percent of the units by October 1996. Throughout this period, its Schedule 13D consistently stated that the acquisitions were for investment purposes. For a considerable period, Gotham disclosed no plans or purposes in making the purchases apart from indicating that it would evaluate the investment from time to time and might buy or sell Hallwood units in the future. In June 1997, however, Gotham amended its filing to reveal that it would seek to remove Hallwood's general partner.

In 1997, Gotham sued Hallwood and certain of its affiliates, officers and directors in the Delaware Chancery Court. It alleges breaches of fiduciary duty, breaches of the partnership agreement, and other claims. The case remains pending.

*Other Purchasers of Hallwood Units*

In February 1998, PMG filed a Schedule 13G[3] with the SEC in which it disclosed that it had acquired 6.14 percent of the

---

**2.** Certain of defendants have submitted affidavits in support of the motions that controvert plaintiff's allegations. In view of the early stage of the litigation, the Court declines to convert the motion into one for summary judgment and therefore disregards the affidavits.

**3.** A Schedule 13G is similar to a Schedule 13D, but it may be filed only by certain classes of purchasers and by them only if they have no intent to change or influence the issuer or to act in concert with others who so intend. *See* 17 C.F.R. § 240.13d–1(c) (1999).

outstanding Hallwood units. By January of this year, it had amended its filing to disclose an aggregate holding of 6.5 percent. The filings consistently reported that PMG acquired the units "in the ordinary course of business and ... not ... for the purpose of ... changing or influencing the control of the issuer ... and ... not ... in connection with or as a participant in any transaction having such purpose or effect."

Gotham and PMG were not alone. In November 1998, Interstate filed a Schedule 13D disclosing that it had acquired 5.7 percent of the outstanding units. In its latest filing, it disclosed ownership of a total of 8 percent of Hallwood. At no time, however; did it disclose any arrangement or understanding it may have had with any other unit holder concerning any plan or purpose to act in concert with such other holder to change or influence the control of Hallwood. Moreover, its general partner, Stephen Roth, allegedly has acquired, directly or indirectly, beneficial ownership of an additional 5.5 percent of the units.[4]

Finally, EFO allegedly has acquired, directly or indirectly, at least 2 percent of Hallwood's units, although it has filed no schedules under Section 13(d).

*The Group Allegations*

The complaint alleges that Gotham has been planning a takeover of Hallwood from the beginning and that its accumulation of Hallwood units, the Delaware lawsuit against its management, and the solicitation of allies all are parts of its campaign.[5] It asserts that all of the defendants "have formed a group with the express plan and purpose of acquiring control of Hallwood and substantially altering Hallwood's business and operations."[6] These allegations rest on a number of subsidiary premises.

First, the complaint contends that Gotham has acted here pursuant to a *modus operandi* that it has followed in the past. It asserts that an article in the summer 1999 issue of *M & A Journal*, entitled *The Ugly Battle to the Death for the Last Paired–Share REIT*, revealed that Gotham previously took control of another company, First Union, by initially accumulating First Union shares, then suing First Union and its management, and then collaborating with other First Union shareholders to accomplish the takeover.[7] The article, which is an exhibit to Gotham's motion papers, suggests that Gotham schemed to take over First Union without paying a control premium and violated Section 13(d) of the Exchange Act in doing so by, among other things, forming a group with other investment companies to effect the takeover without making the required disclosures.[8]

Second, Hallwood points out that there is a substantial reason for one seeking control to act covertly with a group. Hallwood has a rights plan, or poison pill, that would be triggered if any one unit holder, or group acting in concert, acquired beneficial ownership of more than 15 percent of the units. If the pill were triggered, the value of the units would be significantly diluted.[9] Thus, it would be to the advantage of Gotham or anyone else seeking control to limit its disclosed beneficial interest in Hallwood units to less than 15 percent—as Gotham has done—while covertly acting together with other similarly minded investors.[10]

---

4. The complaint alleges that Roth, through Interstate and other entities, has beneficial ownership of over 13.5 percent and that Interstate alone has 8 percent. Cpt. ¶¶ 22, 39. Thus, it charges that Roth, exclusive of the direct Interstate holdings, beneficially owns 5.5 percent of the units.

5. Cpt ¶ 29.

6. *Id.* ¶ 30.

7. *Id.* ¶¶ 25–26.

8. Schaeffer Aff. Ex. F.

9. Cpt ¶ 31.

10. *Id.* ¶ 32.

Third, Hallwood asserts that PMG and Interstate have been actively involved in prior investments with Gotham or its principals, that principals of Gotham have long-standing personal relationships with Interstate's Roth, that William A. Ackman and other Gotham principals have communicated repeatedly with PMG and Interstate in order to entice them into buying significant stakes in Hallwood, and that the PMG and Interstate purchases were part of that effort.[11] They allege similar circumstances involving EFO, whose principals, including Christopher Mahowald, knew Gotham, had extensive discussions with Gotham and PMG concerning Gotham's plans for Hallwood in the event of a successful takeover, and which ultimately decided to join the group.[12] Indeed, EFO is alleged to have prepared and distributed an Investment Recommendation touting investment in Hallwood and seeking to enlist others to join the Gotham-led takeover.[13]

The complaint asserts that "all defendants have agreed that after a takeover, they should act quickly to realize the net asset value of Hallwood by liquidating Hallwood's real estate holdings, selling Hallwood as a whole to another real estate operating company or inserting new management to recapitalize the Company ...."[14] Hallwood maintains that the alleged Gotham group now controls over 40 percent of its outstanding units and continues to purchase units and solicit new group members.

### Hallwood's Claims

The complaint contains five claims for relief. The first three charge Section 13(d) and (g) violations, as applicable, against Gotham, PMG, and Interstate and Roth, respectively. The fourth charges a Section 13(d) violation by all defendants in failing to disclose that they are acting as a group for the purpose of gaining control of Hallwood. The fifth seeks a declaration that Hallwood's poison pill has been triggered by the concerted action of all of the defendants.

### Defendants' Motions

All of the defendants move to dismiss the complaint, essentially on the ground that it fails to state a claim upon which relief may be granted and fails to plead fraud with the particularity required by Rule 9(b)[15] and the Private Securities Litigation Reform Act ("PSLRA").[16] PMG moves, in addition, to dismiss for lack of personal jurisdiction over it or, in the alternative, to sever the claims against it and transfer them to the Central District of California on the grounds that venue is improperly laid in this district or for the convenience of parties and witnesses and in the interest of justice. This opinion resolves all of defendants' motions save so much of PMG's motion as seeks dismissal for lack of personal jurisdiction or, alternatively, severance and transfer. The Court reserves decision on those aspects of that motion.

### Discussion

### The Section 13(d) and (g) Claims

Section 13(d)(1) of the Exchange Act provides in relevant part:

"Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security ... and filed [*sic*] with the Commission, a statement containing such of the following information, and such additional information, as

11. *Id.* ¶¶ 33–34.

12. *Id.* ¶ 35.

13. *Id.* ¶ 36.

14. *Id.* ¶ 37.

15. FED. R. CIV. P. 9(b).

16. 15 U.S.C. § 78u–4.

the Commission may ... prescribe ...—

"(A) the background and identity ..., and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been made or are to be effected;

\* \* \* \* \* \*

"(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

"(D) the number of shares of such security which are beneficially owned ... by (i) such person, and (ii) by each associate of such person ...." [17]

Section 13(d)(3) further provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection." [18]

*The Group Issue*

The fourth cause of action asserts that Gotham, PMG, Interstate, Roth and EFO acted together for the purpose of acquiring Hallwood units, "have a common plan of significantly altering Hallwood's business and operations" and therefore are a "group" within the meaning of Section

13(d)(3), but have failed to disclose their decision to act together as required by Section 13(d)(1) and Rule 13d–1 thereunder. [19]

 Rule 9(b) requires that all averments of fraud be stated with particularity. [20] In this circuit, that long has meant the plaintiff must allege with particularity the circumstances constituting the fraud and *scienter*. [21] In order adequately to plead *scienter*, the plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." [22] A strong inference of fraudulent intent is made out "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." [23] These standards recently have been codified in the PSLRA. [24]

 The fraud alleged in the fourth cause of action is the knowing non-disclosure, in a series of 13D and 13G filings, of the fact that the defendants were part of a group. There is no lack of specificity in plaintiff's allegations. The "who, what, where, when and why" all are set forth with abundant clarity. Nor could one seriously question, assuming that a group existed, that sophisticated investors such as these knew of their obligation to disclose that fact and therefore that there is "strong circumstantial evidence of conscious misbehavior" which amply satisfies both Rule 9(b) and the PSLRA. The issue that is hotly disputed, however, is whether plaintiff has adequately pleaded the existence of a group.

**17.** 15 U.S.C. § 78m(d)(1).

**18.** *Id.* § 78(d)(3).

**19.** Cpt ¶¶ 76–95.

**20.** FED. R. CIV. P. 9(b).

**21.** *See, e.g., Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994); *Advanced Marine Tech., Inc. v. Burnham Securities, Inc.*, 16 F.Supp.2d 375, 383 (S.D.N.Y.1998).

**22.** *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996).

**23.** *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

**24.** *Press v. Chem. Invest. Services Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999) (PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit").

The standard by which this question is to be decided is not self evident, contrary to defendants' assumption. If a buyer of a house sued the seller for fraud, alleging that the seller represented that the house was in good condition but knowingly failed to disclose that the house was infested with termites, Rule 9(b) would require particularity in the allegations that the representation was made, its substance, and the seller's knowledge that the facts were otherwise. But it is perhaps debatable that it would require particularized allegation substantiating the existence of the termite infestation. The infestation would be nothing more than an objective fact as to which the seller allegedly deceived the buyer, not a part of the fraudulent conduct. And the same arguably is true of the existence of the group here. The existence of the group in and of itself was not deceptive. The fraud, if there was one, lay in the concealment of its existence. Thus, in arguing that the particularity requirements of Rule 9(b) and the PSLRA, or at least the elements of those requirements that govern the pleading of *scienter*, apply to the allegation of the existence of the group, defendants may be conflating the averments of fraud with other averments that are not subject to such stringency in pleading. But there is no need to decide this question here. As this Court previously has held, a conclusory allegation of the existence of a group is insufficient under any standard.[25] Nevertheless, plaintiff's allegations here are more than enough to entitle it to an opportunity to prove that defendants were acting as a group.

To begin with, there is ample basis for plaintiff's allegation that Gotham's intentions go beyond a passive investment in Hallwood. Documents submitted by Gotham in support of its motion to dismiss demonstrate that Hallwood at relevant times has been trading at a substantial discount to its net asset value.[26] Thus, one acquiring control of Hallwood would have the opportunity to realize a substantial profit by liquidating its assets and distributing the proceeds to the unit holders. Moreover, Gotham has alleged in its Delaware action that Hallwood's management undertook a series of transactions for the purpose of entrenching the general partner in order to permit the general partner to continue receiving allegedly excessive management fees.[27] Assuming that Gotham did not misrepresent its state of mind in its own complaint, there is no reason to suppose that it thought Hallwood's present general partner likely to liquidate Hallwood and realize for the unit holders the benefit of the differential between the net asset value and the market price. In consequence, Gotham's own admissions afford a clear and persuasive basis for plaintiff's assertion that Gotham's goal is to capture control of Hallwood.

Nor is there any mystery about why Gotham would regard it as being in its interest to find allies to assist covertly in obtaining control. Hallwood, like many other companies, has a rights plan designed to discourage hostile takeover bids. Briefly stated, and in relevant part, it provides that if any person or group (within the meaning of Section 13(d) of the Exchange Act) shall become the beneficial owner of 15 percent or more of the units, unit holders other than such person or group will have the right to purchase additional units of Hallwood at half price,[28] thus greatly diluting the interest of such person or group and rendering a takeover more difficult and expensive. Hence, if Gotham could enlist covert allies in its

---

**25.** *See Strauss v. American Holdings, Inc.,* 902 F.Supp. 475, 479 (S.D.N.Y.1995).

**26.** *E.g.,* Schaeffer Aff, Ex. G, at 2 (54% discount to estimated net asset value as of July 30, 1999); *id.* Ex. C, ¶¶ 18–25, 45–46 (Gotham Delaware complaint alleging that net asset value exceeded market price at all relevant times).

**27.** Schaeffer Aff. Ex. C, ¶ 19.

**28.** *Id.* Ex. E, *passim* and Ex. A thereto.

alleged goal of taking over and dismembering Hallwood, it could avoid triggering the poison pill while at the same time amassing substantial influence or control over the company.

Finally, other circumstances alleged by Hallwood lend substantial support, beyond the coincidence of their economic interests, to the allegation that the defendants are acting together. Interstate's Roth and Gotham's principals have long-standing personal relationships. Both PMG and Interstate have been actively involved in previous investments by Gotham or its principals. Moreover, Hallwood asserts that there has been extensive communication between Gotham, PMG, Interstate, Roth and EFO concerning Gotham's plans with respect to Hallwood.

In these circumstances, defendants' characterization of plaintiff's group allegation as conclusory is baseless. Plaintiff has alleged means, motive and opportunity. There is nothing vague or far-fetched about any of the evidentiary bases upon which it invites the trier of fact to draw the inference that defendants are acting as a group. Indeed, it is well to bear in mind that the allegation that defendants are acting as a group is analogous to a charge of conspiracy—both assert that two or more persons reached an understanding, explicit or tacit, to act in concert to achieve a common goal—and that defendants in criminal cases regularly are convicted of conspiracy beyond a reasonable doubt on less direct evidence of agreement than plaintiff here alleges. While plaintiff ultimately may fail to persuade the trier to infer that defendants are acting as a group, it is entitled to try.

Defendants' other efforts to avoid this conclusion are equally unavailing. Gotham argues, for example, that "it is entirely counterintuitive to assume that sophisticat-ed institutional investors such as Gotham ... would knowingly risk securities liability by entering into a *formal* undisclosed arrangement 'to take over Hallwood.'"[29] Perhaps. But Hallwood does not allege that there was a "formal" arrangement, and no formal arrangement is required.[30] Moreover, the reports are filled with sophisticated companies and investors that knowingly risked—and sustained—securities liability by all sorts of conduct, not least of it violations of the Williams Act of which Section 13(d) is a part. The argument brings to mind, for example, *Wellman v. Dickinson,* a case in which a series of share purchases by Sun Oil was found to constitute an illegal tender offer and in which Sun had made the challenged acquisitions through an entity created for the purpose and named L.H.I.W., Inc.—an acronym for Let's Hope It Works.[31] The plain fact is that even sophisticated investors knowingly skate close to, and from time to time cross, the line dividing lawful from unlawful conduct. Gotham's argument comes close to asserting that there is a suit-and-tie exception to the securities laws.

Gotham's final argument is based on a series of premises: that Hallwood's general partner has a *de facto* veto over any vote to remove itself as general partner; that Gotham is challenging that veto in the Delaware courts; that if Gotham and allies already control 40 percent of the units, Gotham would have sufficient influence to affect the selection of a new general partner if it wins in Delaware; and that Hallwood's present general partner will retain its *de facto* veto if Gotham loses in Delaware. It therefore reasons that it has no economic motive either to pursue the costly Delaware litigation or to "increas[e] its

---

**29.** Gotham Mem. at 11 (emphasis added).

**30.** *See, e.g., Wellman v. Dickinson,* 682 F.2d 355, 363 (2d Cir.1982); *SEC v. Drexel Burnham Lambert, Inc.,* 837 F.Supp. 587, 607 (S.D.N.Y.1993).

**31.** 475 F.Supp. 783, 790, 810 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (2d Cir.1982), *cert. denied, Dickinson v. SEC,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

leverage in Hallwood at the expense of the securities laws . . . ."[32]

The argument is absurdly wide of the mark. To be sure, the general partner's alleged veto over any vote to remove it is a major obstacle to any takeover. That is why the Delaware litigation has been brought. But success in the Delaware action would be of limited value unless Gotham were in a position at least to influence substantially if not dictate the selection of a new general partner. It could not do that without controlling a major block of the units, quite likely considerably more than 14.82 percent. And it cannot itself acquire more than 15 percent of the units without triggering the poison pill. So the motive for a covert group is plain—it is to position Gotham to take advantage of victory in the Delaware case, should that be the result. Indeed, an August 1999 EFO report attached to Gotham's motion papers predicts precisely that victory,[33] a view apparently shared by Gotham as evidenced by its continued pursuit of that lawsuit.

■ Accordingly, the Court holds that the allegations that defendants are part of a group and that they violated Sections 13(d) and (g) of the Exchange Act and Rule 13d–1 thereunder state a legally sufficient claim for relief. Whether plaintiff can prove its allegations, of course, is another matter entirely.

*Gotham's Purpose*

■ The first cause of action alleges that Gotham violated Section 13(d) and Rule 13d–1 by stating that it acquired Hallwood units for investment purposes and failing to disclose its true purpose, viz. that it would seek to take over Hallwood and, if successful, would act "quickly to realize the net asset value of Hallwood, by liquidating Hallwood's real estate holdings, selling Hallwood as a whole to another real estate operating company or inserting new management to recapitalize the Company."[34] Gotham claims that this allegation is "entirely frivolous." It takes particular umbrage because the complaint does not mention its June 1997 disclosure of its intent to seek to remove the general partner.[35]

There is no gainsaying the fact that the complaint should have mentioned Gotham's disclosure of its intention to seek to remove the general partner in the course of charging it with unlawful failure to reveal its objectives. Moreover, that fact certainly has a bearing on the extent to which investors might have been misled as to Gotham's intentions. There is quite a difference to other unit holders between a 15 percent holder that is merely a passive investor, on the one hand, and an aggressive proponent of removing existing management, on the other. And if plaintiff had alleged that the 13D and amendments were misleading only because they failed to disclose Gotham's intention to seek to influence control, Gotham presumably would have had a colorable argument that the difference between what it said and what it might have said on that point was not material. But that is not the entirety of plaintiff's claim. Rather, plaintiff contends that the 13D and amendments were misleading because they failed to disclose both Gotham's intent to seek control and its plans for realizing on Hallwood's net asset value in the event it succeeded. For the reasons explained above, there is ample basis for plaintiff's allegations as to the substance of Gotham's plans.[36] In conse-

---

**32.** Gotham Mem. at 12.

**33.** Schaeffer Aff. Ex. G, at 2.

**34.** Cpt. ¶¶ 30, 37, 49–53.

**35.** Gotham Mem. at 19.

**36.** It is true, as Gotham argues, that a "plan" requiring disclosure requires "something more definite than vaguely formed thoughts for the future." Gotham Rep. Mem. at 4 (quoting *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969)). But the pleadings allege, and are sufficient to permit proof of, "something more definite."

quence, the motion to dismiss the first cause of action must be denied.

*PMG*

■ Unlike Gotham, PMG filed a Schedule 13G rather a Schedule 13D. Plaintiff claims that it violated the Exchange Act because it was required to file a Schedule 13D and that its Schedule 13G in any event was false and misleading because the units were acquired for the purpose of influencing the control of Hallwood in connection with the other defendants.[37] PMG, as Gotham, challenges the latter allegations, upon which its eligibility to file a Schedule 13G rather than a Schedule 13D defends, as insufficiently particular.

What has been said already demonstrates that the allegation that PMG is part of a group that seeks to take over Hallwood for the purpose of realizing on its net asset value satisfies Rule 9(b) and the PSLRA. Hence, the only remaining question raised by PMG's motion relates to its eligibility to file on Schedule 13G.

Rule 13d–1(c) provides that a person otherwise required to file a Schedule 13D may make a short-form filing on Schedule 13G provided it:

"(1) Has not acquired the securities with any purpose, or with the effect of, changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect . . .;

"(2) Is not a person reporting pursuant to paragraph (b)(1) of this section; and

"(3) Is not directly or indirectly the beneficial owner of 20 percent or more of the class." [38]

In view of the legal sufficiency of plaintiff's allegations that PMG acquired its Hallwood units for the purpose of influencing the control of the issuer and in connection with the other defendants' planned takeover, plaintiff's contention that PMG violated the Exchange Act by filing on form 13G rather than 13D is sufficient to withstand PMG's motion to dismiss.

### The Holdings of Interstate and Roth

■ The third cause of action alleges that Interstate and Roth violated Section 13(d) because Interstate's Schedule 13D, as amended, discloses aggregate ownership of 8 percent of the outstanding Hallwood units whereas Interstate, Roth and entities controlled by them or over which they have substantial influence actually have beneficial ownership of approximately 13.5 percent of the units.[39] It charges also that Roth was obliged to make a personal filing but failed to do so.[40] Once again, these defendants attack the complaint on grounds of insufficient particularity.

The plaintiff's contention that Interstate and Roth are beneficial owners of 13.5 percent of Hallwood units is made on information and belief.[41] Under long standing precedents in this circuit and under the PSLRA, a plaintiff making such an allegation on information and belief must set forth the factual basis on which it rests.[42] Here, plaintiff rests the allegation on a statement contained in EFO's investment recommendation which appears in a paragraph disclosing that Gotham had had conversations with EFO about investment in Hallwood.[43] In all the circumstances,

---

37. Cpt. ¶¶ 55–63.

38. 17 C.F.R. § 13d–1(c) (1999).

39. Cpt. ¶¶ 64–74.

40. *Id.* ¶ 74.

41. *Id.* ¶ 70.

42. 15 U.S.C. § 78u–4(b)(1); *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997); *Luce v. Edelstein,* 802

F.2d 49, 54 n. 1 (2d Cir.1986); *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972).

43. Schaeffer Aff. Ex. G, at 17.
It should be noted that the investment recommendation states also that "[t]he principals of Gotham claim to have a long-standing personal relationship with Roth but have purposely avoided conversations about Hallwood so as

the Court is not prepared to say that there is so little basis for plaintiff's allegation as to deprive it of the opportunity to seek to prove its accuracy.

### Prayer for Relief

Hallwood seeks a variety of forms of far reaching equitable relief. Interstate and Roth contend that no relief beyond corrective disclosure would be appropriate in this case even if Hallwood were to prevail and therefore invites the Court to strike the more ambitious prayers for relief.

While there may prove to be merit to these defendants' position, one must bear in mind that the closing part of a complaint is called a prayer for a reason. It is not always answered. In the circumstances of this case, little purpose would be served in focusing on what relief might be appropriate if plaintiff prevails. After all, equity is noted for its ability to mold relief to the precise circumstances of a given case. Without knowing those circumstances, it would be folly to attempt to delimit its reach. The Court declines to do so at this stage.

### The Rights Plan

■ Gotham moves also to dismiss the fifth cause of action, which in substance seeks a declaration that defendants have triggered the Hallwood rights plan, on the ground that Hallwood has failed to join indispensable parties, viz. Hallwood's general partner, its transfer agent and other Hallwood unit holders. Consideration of this argument requires a somewhat greater explanation of the mechanics of the rights plan.

As Hallwood points out, its rights plan is a straightforward "poison pill." If a person or group acting in concert acquires 15 percent of more of the outstanding units without Hallwood's prior approval, it thereby becomes an "Acquiring Person." Insofar as is relevant here, upon the close of the tenth business day following the public announcement by Hallwood or an Acquiring Person that the Acquiring Person has become such, Hallwood's unit holders (other than the Acquiring Person) gain the option to purchase additional units at half price, effectively diluting the ownership interest of the Acquiring Person.[44] The role of the transfer agent, which is the rights agent under the rights plan, is the ministerial one of distributing rights certificates to unit holders, receiving elections by unit holders to exercise their purchase options, and issuing additional units.[45] Hallwood's general partner has no role at all except insofar as it acts on behalf of Hallwood.[46]

The question whether any of the general partner, the transfer agent or other unit holders is an indispensable party is governed by Rule 19.[47] The Court first determines whether the allegedly indispensable party is "necessary" within the meaning of Rule 19(a). If it is necessary, the court must either order its joinder or, if joinder is not feasible, determine under Rule 19(b) whether its presence is indispensable to proceeding with the action.[48]

A party is "necessary" within the meaning of Rule 19(a) if complete relief cannot be granted in its absence or the party claims an interest in the subject matter of the action:

> "and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."

to not trigger the poison pill." *Id.* This self serving declaration by Gotham of course is not binding on plaintiff here.

44. Schaeffer Aff. Ex. E, §§ 1(a), 1(v), 3, 7, 11.

45. *Id.* §§ 3, 7.

46. *Id.* at 1.

47. FED. R. CIV. P. 19.

48. *See generally ConnTech Dev. Co. v. Univ. of Conn. Educ. Properties, Inc.*, 102 F.3d 677, 681 (2d Cir.1996).

Neither Hallwood's general partner nor the transfer agent is necessary in this sense. The machinery of the Hallwood poison pill is set in motion only by a declaration either by Hallwood or by the putative Acquiring Person that the putative Acquiring Person in fact is such, i.e., a beneficial owner of more than 15 percent of the units. The controversy on that point is purely between Hallwood and the defendants. Neither Hallwood's general partner nor the transfer agent has any rights or obligations that must be litigated in order to determine that question or to grant complete relief. Neither is so situated that its interests would be impaired by litigation of this question in its absence or would leave it subject to inconsistent obligations by reason of any interest in the controversy.

Gotham's position with respect to other unit holders at first blush seems somewhat more persuasive because the other unit holders do have rights under the rights plan. But that initial impression does not withstand analysis. The rights plan recognizes that the rights of unit holders are entirely dependent upon Hallwood. No unit holder has the right to determine that an Acquiring Person exists or to act on that determination, although a unit holder does have the right to sue to compel Hallwood to do so.[49] This is consistent with the general principle that the management of corporations and limited partnerships is vested in their boards of directors and general partners, respectively. So it is not surprising that the Delaware courts, when confronted with virtually the precise question at bar—whether other rights holders need be joined in litigation such as this under Delaware's Chancery Rule 19—has held that they need not "because the rights holders' interests are fully protected by" the issuer.[50]

In sum, none of the supposedly indispensable parties need be joined here. The general partner and the transfer agent have no interest cognizable under Rule 19 in the question whether the defendants are an Acquiring Person. The other unit holders are adequately represented by Hallwood on that issue.

*Conclusion*

For the foregoing reasons, the motions of defendants Gotham, Interstate and Roth, and EFO to dismiss the complaint are denied in their entirety. The motion of defendant PMG is denied in all respects save that the Court reserves decision on so much of that motion as seeks dismissal for lack of personal jurisdiction over it or, in the alternative, to sever the claims against it and transfer them to the Central District of California on the grounds that venue is improperly laid in this district or for the convenience of parties and witnesses and in the interest of justice.

SO ORDERED.

**49.** Schaeffer Aff. Ex. E, § 15.

**50.** *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1074 (Del.Ch.), *aff'd*, 500 A.2d 1346 (Del.1985).

Federal law under Rule 19 is to the same effect. *See, e.g., Owens–Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185 (3d Cir., 1979); *Fetzer v. Cities Service Oil Co.*, 572 F.2d 1250 (8th Cir.1978).