LOG ON AMERICA, INC., Plaintiff,

v.

PROMETHEAN ASSET MANAGE-MENT L.L.C., HFTP Investment L.L.C., Fisher Capital Ltd., Wingate Capital Ltd., Citadel Limited Partnership, and Marshall Capital Management, Inc., Defendants.

No. 00 Civ. 6218(RMB).

United States District Court, S.D. New York.

Dec. 10, 2001.

Mark Arthur Berman, David S. Frydman, Steven J. Shore, Schwartzfeld, Gan-

fer & Shore, L.L.P., New York City, for Log On America, Inc.

### DECISION AND ORDER

BERMAN, District Judge.

On or about August 18, 2000, Plaintiff Log On America, Inc. ("Plaintiff" or "LOA") filed this action against defendants Promethean Asset Management L.L.C. ("Promethean") and HFTP Investment L.L.C. ("HFTP" and, together with Promethean, the "Promethean Defendants"); Fisher Capital Ltd. ("Fisher"), Wingate Capital Ltd. ("Wingate") and Citadel Limited Partnership ("Citadel" and, together with Fisher and Wingate, the "Citadel Defendants"); and Marshall Capital Management, Inc. ("Marshall") (the Promethean Defendants, the Citadel Defendants and Marshall are collectively, the "Defendants"), asserting claims under the Securities Exchange Act of 1934, as amended (the "1934 Act"), specifically Section 10(b), 15 U.S.C. § 78j(b), Section 13(d), 15 U.S.C. § 78m(d), and Section 16(b), 15 U.S.C. § 78p(b); and claims for common law fraud, breach of contract, and breach of the covenants of good faith and fair dealing under New York law. Plaintiff seeks damages, injunctive relief, declaratory relief, rescission, disgorgement, and costs. Defendants [1] now move to dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."). **For the reasons stated below, Defendants' motion to dismiss is granted.**[2]

### I. Background

Plaintiff is a Delaware corporation with its principal place of business in Providence, Rhode Island. (Complaint ("Compl.") ¶ 7). Plaintiff provides telephone service, high-speed Internet access, and cable programming to homes and businesses throughout the Northeast of the United States. (*Id.*).

Defendant HFTP is a limited liability company, organized and doing business in New York, engaged principally in the business of investments and financial services. (*Id.* at ¶ 8). Defendant Promethean, a New York company, is an affiliate of HFTP and also its investment advisor. (*Id.* at ¶ 9). Defendants Fisher and Wingate are limited partnerships organized under the laws of the Cayman Islands and have offices in Chicago, Illinois. (*Id.* at ¶¶ 10, 11). Fisher and Wingate are venture capital lenders. Defendant Citadel, a limited partnership, is a registered broker-dealer and is the trading manager of both Fisher and Wingate. (*Id.* at ¶ 12). Defendant Marshall, an Illinois (venture capital) investor corporation doing business in New York, is a wholly-owned subsidiary of Credit Suisse Group and an affiliate of Credit Suisse First Boston Corporation. (*Id.* at ¶ 13).

On February 23, 2000, LOA entered into the following financial agreements with HFTP, Fisher, Wingate, and Marshall: (i) Securities Purchase Agreement (the "Agreement"); (ii) Registration Rights Agreement ("Registration Agreement"); and (iii) Certificate of Designations, Preferences and Rights of Series A Convertible Preferred Stock of Log On America, Inc. (the "Certificate of Designations") (collectively, the "Transaction Documents"). Under the Transaction Documents, HFTP, Fisher, Wingate, and Marshall (cumulatively) paid to LOA $15 million in exchange for: (i) 15,000 shares

---

1. The Court recognizes that the individual Defendants may have performed (somewhat) different roles but concludes that such differences, except as noted, are not material to the analysis of the instant motion.

2. The Court is in no way ruling upon the ultimate merits of Plaintiff's claims.

of LOA's Series A Convertible Preferred Stock ("Preferred Stock"); [3] and (ii) 594,-204 warrants (the "Warrants") for the purchase of LOA common shares ("Common Stock"). (*Id.* at ¶ 28).[4]

■ Plaintiff acknowledged that "its obligation to issue Conversion Shares upon conversion of the Preferred Shares ... is ... absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other stockholders of [LOA]." (Agreement § 3(m)). The Certificate of Designations contains a "*conversion cap*" (or "*blocker*") limiting the beneficial ownership by any holder of Preferred Stock and its affiliates to 4.99% of the total outstanding shares of Plaintiff's common stock.[5] The Promethean Defendants and Citadel Defendants entered into separate letter agreements with LOA, each incorporated into the Agreement, precluding them from converting Preferred Stock if doing so would cause the number of shares of Common Stock owned by any one of them during any 60-day period to exceed 10% of LOA's Common Stock. (*See* Affidavit of Adrienne M. Ward, dated October 3, 2000 ("Ward Aff."), Exs. 8 and 9).[6]

The Agreement provided that Defendants were acquiring the Preferred Stock and Warrants "for investment only". It did not by its terms constrain Defendants to hold the securities for any minimum period of time:

> *Investment Purpose.* Such Buyer (i) is acquiring the Preferred Shares and the Warrants, (ii) upon conversion of the Preferred Shares, will acquire the Conversion Shares issuable upon conversion thereof and (iii) upon exercise of the Warrants, will acquire the Warrant Shares issuable upon exercise thereof ... for its own account **for investment only and not with a view towards, or for resale** in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act; provided, however, that by making the representations herein, **such Buyer does not agree to hold any of the securities for any minimum or other specific term and reserves the right to dispose of the secu-**

---

**3.** Defendants were granted the right to convert their Preferred Stock into Common Stock at a fixed discount to market at the time of conversion. (*Id.* at ¶ 3). Plaintiff states that this type of Preferred Stock, which is based on a "floating" conversion ratio, is known as "floorless convertible," "toxic convertible," or "death spiral convertible." (*Id.* at ¶ 2). According to Plaintiff, the lower the market price of the common stock at the time of conversion, the greater the number of shares Defendants would receive upon conversion of Preferred Stock. (*Id.* at ¶¶ 19, 41).

**4.** All of the Transaction Documents were submitted as exhibits to the Complaint and incorporated by reference therein, and are properly considered by the Court on this motion to dismiss. *See Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999).

**5.** Section 5(a) of the Certificate of Designations states:

> *Limitation on Beneficial Ownership.* The Company shall not effect any conversion of Preferred Shares and no holder of Preferred Shares shall have the right to convert Preferred Shares in excess of that number of Preferred Shares which, upon giving effect to such conversion, would cause the aggregate number of shares of Common Stock beneficially owned by the holder and its affiliates to exceed 4.99% of the total outstanding shares of Common Stock following such conversion.

**6.** On a motion to dismiss, the Court may rely upon "documents attached to the complaint as an exhibit or incorporated in it by reference ... or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing the suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993).

rities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

Agreement § 2(a) (emphasis added).

Defendants were granted the right to sell short LOA Common Stock.[7] However, they agreed not to sell short more than 594,204 shares of Common Stock for a certain period of time:

> *Restriction on Short Sales.* Each buyer agrees that, subject to the exceptions described below, during the period beginning on the Initial Closing Date and ending on but excluding the earlier of (i) the first date on which such Buyer no longer holds any Preferred Shares and (ii) the date which is 180 Days after the Initial Closing Date, neither such Buyer nor any of its affiliates shall engage in any transaction constituting a "short sale" (as defined in Rule 3b–3 of the 1934 Act) of the Common Stock (collectively, "Short Sale"); provided, however, that **each Buyer and its Affiliates are entitled to engage in transactions which constitute Short Sales to the extent that following such transaction the aggregate net short position of such Buyer and its Affiliates does not exceed ... the number of shares of Common Stock equal to the aggregate number of Warrant Shares which such Buyer and its Affiliates have the right to acquire upon exercise of the Warrants held by such Buyer and its Affiliates....**

Agreement § 4(*o*) (emphasis added).

Pursuant to the Agreement, Plaintiff was required to file a Registration Statement covering resale of the common stock underlying the Preferred Stock and Warrants and to request the Securities and Exchange Commission ("SEC") to declare the Registration Statement effective "as soon as practicable, but in no event later than 180 days after [February 23, 2000]." (Registration Agreement § 2(a)(i)). Plaintiff filed a Registration Statement with the SEC on or about April 26, 2000 to register shares of Common Stock on behalf of the holders of Preferred Stock, but the Registration Statement was not declared effective before the 180 day period expired on August 21, 2000.[8]

■ Plaintiff alleges in the instant Complaint that Defendants "wrongfully utilized 'floorless' convertible stocks ... to launch an unlawful scheme to 'short sell' Plaintiff's stock in sufficient volume to drive down its price knowing that they would be in a position to cover the short sales by converting their preferred stock at depressed market prices." (Compl.¶ 2). Plaintiff maintains that Defendants violated the Federal Securities Laws and breached the terms of the Transaction Documents by

---

7. A short sale is predicated on the belief that a particular stock will go down in price. Generally a short transaction begins with the customer committing to sell stock that he or she does not own. The customer "borrows" the stock to be sold, typically from a broker. The customer "covers" the short sale by buying identical stock and restoring it to the broker/lender. If the price of the stock declines, as the customer anticipates, the customer can cover at a lower price than the price at which he or she sold the borrowed stock, profiting from the difference. *See* 17 C.F.R. § 230.3b–3; *Levitin v. PaineWebber,* 159 F.3d 698, 700 (2d Cir.1998).

8. LOA was to "use its best efforts to cause [the] Initial Registration Statement to be declared effective [by August 21, 2000]." (Registration Agreement § 2(a)(i)). On August 21, 2000, Plaintiff filed a form 8–K with the SEC, announcing that "it will not honor requests for conversion of the Preferred Stock and will not register the Common Stock underlying the Preferred Stock." (Ward Aff., Ex. 10); *see Kramer v. Time Warner Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991) (on a motion to dismiss, a court may consider SEC filings, even where they are not referenced in the complaint).

"artificially manipulating the market prices of LOA's common stock through massive and unlawful short sales while in possession of material non-public information concerning LOA's business." [9] (*Id.* at ¶ 4). Plaintiff also alleges that Defendants constituted a "group" for purposes of Sections 13(d) and 16(b) of the 1934 Act analysis and violated both of these Sections because, among other things: (i) Defendants collectively acquired more than 5% of LOA's common stock but have not filed a 13(D) Registration Statement; (*id.* at ¶¶ 73–81); (ii) Defendants collectively own more than 10% of LOA's common stock; and (iii) that any conversions of the Preferred Stock to "cover" a short sale would constitute a "matching" purchase in violation of Section 16(b); (*id.* ¶¶ 82–86). [10]

Defendants state that "[t]he fundamental problem with Plaintiff's claims is that short selling was expressly contemplated and authorized under the Agreement" and that "what Plaintiff is really complaining of here is not fraud or breach of contract, but of having to live up to its obligations under the Agreement." (Memorandum Of Law In Support Of Defendants' Joint Motion To Dismiss The Complaint With Prejudice ("Def.Mem.") at 5, 6). "Indeed, Plaintiff admitted in its Registration Statement that the holders of Preferred Stock could engage in short sales as a legitimate hedging strategy." (*Id.* at 10). Defendants' instant motion contends, *inter alia:* (i) Plaintiff has not alleged any actionable misrepresentation or breach; (*id.* at 8–11, 22–23); (ii) Plaintiff has no standing to assert a market manipulation claim,

and, alternatively, Plaintiff does not plead manipulation with specificity; (*id.* at 15–16); (iii) Plaintiff's insider trading claim is insufficient; (*id.* at 17); and (iv) Plaintiff's Section 13(d) claim fails because Defendants are not subject to that statute's reporting requirements; (*id.* at 18–20); and (v) Plaintiff fails to adequately plead a claim under Section 16(b) of the 1934 Act; (*id.* at 20–21).

## II. Standard of Review

"In reviewing a [Fed.R.Civ.P.] 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (citing *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994)). The movant's burden is very substantial, as "[t]he issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669 (2d Cir.1995) (quoting *Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976) (per curiam)). In sum, "[t]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." *Bower v. Weisman,* 639 F.Supp. 532, 539 (S.D.N.Y.1986) (citing *Arfons v. E.I. du Pont De Nemours & Co.,* 261 F.2d 434, 435 (2d Cir.1958)).

■ In addition, a Rule 10b–5 plaintiff must comply with Fed.R.Civ.P. 9(b) and plead fraud with particularity, so that de-

---

9. While Plaintiff alleges (broadly) that "[all] Defendants have orchestrated a large volume of short sales of LOA common shares," Plaintiff in its pleading states that "Marshal (sic) had informed Plaintiff that the Promethean and Citadel Defendants had shorted hundreds of thousands of shares of LOA common stock." (Compl.¶ 33).

10. Section 16(b) permits a company, or any security holder suing on its behalf, to recover, under certain circumstances, "profit" realized by a person from a purchase and sale, or sale and purchase, of an equity security of the company within a period of less than six months. There is a "profit" for § 16(b) purposes when there is a purchase that can be "matched" against a sale at a higher price.

fendants have "a reasonable opportunity to answer the complaint and ... adequate information to frame a response." *Ryan v. Hunton & Williams*, 99 Civ. 5938(JG), 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000) (quoting *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557–58 (2d Cir.1979)). The Private Securities Litigation Reform Act of 1995 ("PLSRA") requires that in a fraud action, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u4(b)(1) (1997).

## III. Analysis

### A. Section 10(b) and Rule 10b–5

Plaintiff alleges that Defendants engaged in three violations of § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder: "(i) a pattern of misrepresentations and omissions intended to and having the effect of inducing LOA to sell Convertible Preferred Stock to Defendants; (ii) conduct to manipulate downward the market price of LOA's common stock; and (iii) trading on inside information." (Compl.¶ 65).

Defendants contend that: (i) Plaintiff's misrepresentation claims fail because Plaintiff fails to plead sufficiently each of the (four) necessary elements, i.e. because Plaintiff's allegations "are not stated with

**11.** Defendants contend that Plaintiff fails to allege that Plaintiff was "a purchaser or seller of common stock as required under Section 10(b) of the 1934 Act or Rule 10–b". (*Id.* at 16); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730–31, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**12.** Plaintiff also alleges additional misrepresentations and that its fraud claims are based upon material omissions. (Compl.¶ 68). Such

the particularity required by Fed. R. Civ. Rule 9(b)...."; (Def. Mem. at 7); (ii) the market manipulation claim fails because Plaintiff lacks standing [11] and because Plaintiff fails adequately to plead the elements of manipulation; (*id.* at 16–17); and (iii) the insider trading claim fails because Plaintiff does not meet the pleading requirements for such a claim; (*see* Reply Memorandum Of Law In Support Of Defendants' Joint Motion To Dismiss The Complaint With Prejudice ("Def.Reply") at 8).

### 1. Misrepresentation

Plaintiff alleges that Defendants' conduct was "manipulative" and "fraudulent" because it was allegedly contrary to written representations that Defendants would not engage in short sales and that they would hold the Preferred Stock as a long-term investment. (Compl.¶¶ 30–32). The Court finds that these misrepresentation claims as currently stated are inadequate. [12]

To maintain a misrepresentation claim under Section 10(b) of the 1934 Act and Rule 10b–5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false representation or omitted to disclose material information and that the plaintiff's reliance on the defendant's action caused the plaintiff injury." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 83 (2d Cir.1999).

misrepresentations and omissions, as currently pled, are not sufficiently specific. *See* Fed. R.Civ.P. 9(b). For example, with respect to alleged pre-arranged trades, it is unclear whether they subsume short sale claims or whether they are independent claims and, if they are independent, what specifically they entail. (*See* Plaintiff's Memorandum Of Law In Opposition To The Joint Motion To Dismiss The Complaint With Prejudice ("Pl.Opp.") at 12; Compl. ¶ 36).

*Short sales*

■ Section 4(*o*) of the Agreement explicitly authorizes Defendants to make short sales of up to 594,204 shares of Common Stock.[13] **"[E]ach Buyer and its Affiliates are entitled to engage in transactions which constitute Short Sales to the extent that following such transaction the aggregate net short position of such Buyer and its Affiliates does not exceed ... the number of shares of Common Stock equal to the aggregate number of Warrant Shares which such Buyer and its Affiliates have the right to acquire upon exercise of the Warrants held by such Buyer and its Affiliates (without regard to limitations on exercises of the Warrants)."** (Agreement § 4(*o*)) (emphasis added). Plaintiff contends that this " 'carve out', upon which Defendants rely [for the right to sell short] never 'matured' " because "the Warrants were never 'in the money.' " (Pl. Opp. at 8). Plaintiff cites no language in the Agreement in support of its position. "[The Agreement] says nothing about being in the money or out of the money." *Log On America v. Promethean Asset Mgmt., et al.*, 00 Civ. 6218(RMB), Tr. at 27 (S.D.N.Y. Dec. 1, 2000) (oral argument; counsel for Defendants).

The Court finds that the language in Section 4(*o*) is plain and unambiguous. It authorizes the very activity Plaintiff says is impermissible, namely short sales. (Agreement § 4(*o*)). Plaintiff's interpretation, as noted by Defendants, "would strain the contract language beyond its reasonable and ordinary meaning." (Def. Reply at 5 (citing *Royal Ins. Co. of America v. Sportswear Group, LLC*, 85 F.Supp.2d 275, 280 (S.D.N.Y.2000))). Plaintiff has, therefore, failed to allege that Defendants have acted in a way that was not in conformity with the Agreement with respect to short sales. It is also difficult, on these pleadings, to ascertain the elements of scienter, reliance or causation with respect to short sales. *See, e.g., Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir.1992) (scienter); *Global Intellicom v. Thomson Kernhagan & Co.*, 99 Civ. 342(DLC), 1999 WL 544708 (S.D.N.Y. July 27, 1999) (reliance and causation).[14]

*Investment Intent*

The Agreement (itself) makes clear that while they were purchasing for investment, Defendants were not obligated to hold the Preferred Stock for any specified period of time. **"[B]y making the representations herein, such Buyer does not agree to hold any of the securities for any minimum or other specific term and reserves the right to dispose of the securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act."** (Agreement § 2(a)) (emphasis added).[15] It is difficult to

---

13. The Complaint does not clearly or specifically allege that Defendants sold short more than 594,204 shares. (*See* Compl. ¶ 33; *cf.* Pl. Opp. at 8).

14. In *Global*, the Court dismissed plaintiff's claims under Section 10(b) of the 1934 Act and Rule 10b–5 **notwithstanding an oral representation that defendant would not short sell** because any reliance on such representation would be unreasonable. 1999 WL 544708, at *11; *see also Log On America*, 00 Civ. 6218(RMB), Tr. at 3–4 (oral argument).

15. Section 2(a) of the Agreement states that the Buyer will acquire the Conversion Shares and the Warrant Shares for "investment only...." The Court notes that Rule 144(d)(1) of the Securities Act of 1933, entitled "Holding period for restricted securities" provides, in relevant part: "A minimum of one year must elapse between the later of the date of the acquisition of the securities from the issuer, and any resale of such securities in reliance on this section for the account of either the acquiror or any subsequent holder of those securities." 17 C.F.R. § 230.144.

"Rule 144 does not expressly preclude a holder of restricted securities from effecting a short sale of shares of the same class as the restricted shares. However, the short position

ascertain the basis for a misrepresentation claim upon the instant conclusory pleadings as to investment intent. *See Ochs v. Shearson Lehman Hutton Inc.*, 768 F.Supp. 418, 428 (S.D.N.Y.1991).

Plaintiff, citing *Jewelcor Inc. v. Pearlman*, 397 F.Supp. 221 (S.D.N.Y.1975), contends that ascertaining Defendants' investment intent (generally) is a factual issue and cannot be resolved on a motion to dismiss. But here Plaintiff has not specified clearly how Defendants' investment representation(s) give rise to actionable (mis)conduct, i.e. conduct which is violative of the Agreement. *See, e.g., Ochs*, 768 F.Supp. at 428 ("The pleading therefore comes down to such sweeping, conclusory allegations as '[Defendant's] national network of brokers used high pressure sales tactics' ... and that all defendants (without specifying among them) concealed material information or misled plaintiffs, again without giving particulars.... These allegations of fraud are deficient....."). Among other things, Defendants were not precluded from selling under the Agreement and, in fact, Plaintiff has not alleged that Defendants sold the Preferred Shares or the Warrants. [16]

 Under New York law, "the initial interpretation of a contract 'is a matter of law for the court to decide.'" *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) (quoting *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996)); *see also Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990) ("Whether a contract is ambiguous is a question of law."). A court should construe a contract as a matter of law if, as here, the contract is unambiguous on its face. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993). Contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Metropolitan Life*, 906 F.2d at 889. Section 2(b) of the Agreement is clear and unambiguous and does not require Defendants to hold the Preferred Stock or Warrants for a minimum period of time. *See Compania Financiera Ecuatoriana de Desarollo v. Chase Manhattan Bank*, 97 Civ. 5724 (JGK), 1998 WL 74299, at \*4 (S.D.N.Y. Feb. 19, 1998) ("[T]he unambiguous language of the Agreement provides that [Plaintiff] assigned to [Defendant] both 'interest on the principal ... which accrues prior to the Effective Date and interest thereon which accrues on or after the Effective Date.' Nothing about the language of that provision nor any other provision supports the interpretation that [Plaintiff] urges is correct. Therefore, [Defendant's] motion to dismiss is granted since [Defendant] was not required under the Agreement to hold any interest pay-

---

may not be covered with the restricted securities, unless such securities were eligible for sale under Rule 144 at the time of the short sale, and the requirements of Rule 144 were met at the time of the short sale. It is not sufficient that the requirements of Rule 144 are met at the time the short position is covered. However, the short seller could sell the restricted securities pursuant to Rule 144 (when available) and purchase unrestricted shares in the market to cover the short position." Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 3:61 (1998) (internal citations omitted).

16. The Court notes that in June 1995, the SEC began to reexamine Rule 144 in light of the fact that "holders of restricted and control shares [were] selling interests in such shares while retaining legal title to the 'underlying' security." Bloomenthal & Wolff, *supra*, § 3:61 (citing SEC Act Release No. 7187, [Current Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 85,638, at 86,883 (June 27, 1995)). The SEC solicited public comment on whether it is "appropriate to treat securities as 'held' in the private markets if the economic risk of investment has been shifted to the public markets?" *Id.*

ments in trust for [Plaintiff] or to transfer any interest payments it received to [Plaintiff].").

As noted, Plaintiff does not allege that Defendants, in fact, sold any of the Preferred Stock or the Warrants. (*See* Compl. ¶ 50) ("such securities have not yet been converted"). Plaintiff contends that "[w]hether or not Defendants ultimately convert is irrelevant to the issue of whether Defendants misrepresented their intent *ab initio.*" (Pl. Opp. at 7). This argument is not persuasive: as noted, it is difficult to find a "misrepresentation" where, as here, the accused party is not alleged to have done what he agreed (presumably intended) not to do and where, even if he did, he was contractually permitted to do so. *See, e.g., Berger v. Manhattan Life Ins. Co.,* 805 F.Supp. 1097, 1104 (S.D.N.Y.1992) (no misrepresentation found where defendant provided no evidence that plaintiff had ever "received advice or treatment for alcohol addiction" where, earlier, he stated that he "had never received advice or treatment for alcohol addiction....")." It is also difficult to find scienter, reliance, and causation in the instant pleadings and in such circumstances. *See, e.g., Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir. 1996) (To plead scienter, the plaintiff must "allege facts that give rise to a strong inference of fraudulent intent."); *Global Intellicom,* 1999 WL 544708, at *9–10.[17]

### 2. Market Manipulation

Plaintiff alleges that Defendants engaged in "conduct to manipulate downward the market price of LOA's common stock." (Compl.¶ 65). Defendants contend that Plaintiff does not have standing to bring a market manipulation claim because "Plaintiff fails to allege that it was a purchaser or seller of common stock," (Def. Mem. at 16), and, alternatively, that Plaintiff has not alleged manipulation with particularity. (*Id.* at 16–17). In response, Plaintiff contends that "[t]he conversion feature of a convertible security qualifies as a contract for the purchase or sale of a security, and thus satisfies the 'purchase' or 'sale' requirement." (Pl. Opp. at 16 (emphasis omitted) (citing *Pittsburgh Terminal Corp. v. Baltimore and Ohio R.R. Co.,* 680 F.2d 933, 939–40 (3d Cir.1982) and *FS Photo Inc. v. PictureVision Inc.,* 61 F.Supp.2d 473, 478 (E.D.Va.1999))).

The elements of a market manipulation claim under Section 10(b) are: "(1) damages, (2) caused by reliance on defendants' misrepresentations or omission of material fact, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange." *Global Intellicom,* 1999 WL 544708, at *7. Pleading requirements with respect to market manipulation claims may sometimes be relaxed because "market manipulation claims present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs." *In re Blech Securities Litig.,* 928 F.Supp. 1279, 1290–91 (S.D.N.Y.1996). Plaintiffs are required to lay out the "nature, purpose, and effect of the fraudulent conduct and the roles of the defendant" without necessarily specifying instances of the (mis)conduct. *Id.* at 1291.

---

**17.** Plaintiff relies upon *Hallwood Realty Partners, L.P. v. Gotham Partners,* 95 F.Supp.2d 169 (S.D.N.Y.2000) for the proposition that Defendants' alleged scheme was entirely inconsistent with its "investment only" representation. However, the *Hallwood* complaint survived a motion to dismiss under "group" pleading allegations pursuant to Sections 13(d) and 13(g) of the 1934 Act and Rule 13d–1. *See Hallwood Realty,* 95 F.Supp.2d at 177. The defendants in *Hallwood* were not alleged to have misrepresented their investment intent pursuant to Section 10(b) of the 1934 Act and Rule 10b–5.

■ Preliminarily, the Court addresses Defendants' challenge to Plaintiff's "standing." Under Section 10(b) of the 1934 Act or Rule 10–b, a plaintiff must be a purchaser or seller of securities. *See Blue Chip Stamps*, 421 U.S. at 730–31, 95 S.Ct. 1917.[18] In *Global Intellicom v. Thomson Kernaghan & Co.*, United States District Court Judge Denise J. Cote confronted a similar standing challenge and determined that the plaintiff (there) was neither a purchaser nor a seller: "[Plaintiff] has no standing to bring such a claim since it does not allege that it purchased or sold securities in connection with the alleged manipulation." *Global Intellicom*, 1999 WL 544708, at *9. In *Global*, as here, plaintiff alleged that defendants engaged in a number of improper practices to drive down the price of its' common stock. *Id.* at *1.[19]

■ LOA does not here allege to have acted as a purchaser or seller with respect to the securities allegedly sold short by Defendants, apart from its view that the conversion feature of the Preferred Stock qualifies as a contract for the purchase or sale of a security. (Pl. Opp. at 16) ("The conversion feature of a convertible security qualifies as a *contract for the purchase or sale* of a security, and thus satisfies the 'purchase' or 'sale' requirement of *Blue Chip.*" (citing cases) (emphasis in original)). Neither *Pittsburgh Terminal* nor *FS Photo* stands for the proposition that the sale of a convertible security provides an issuer with standing to challenge the kinds of activity alleged here. *See Pittsburgh Terminal*, 680 F.2d at 938–40; *FS Photo*, 61 F.Supp.2d at 478.

At the same time, "the [standing] rule does not necessarily extend to [§ 10(b)] actions seeking injunctive relief." *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 170 (2d Cir.1999); *see also Langner v. Brown*, 913 F.Supp. 260, 270 (S.D.N.Y.1996) (referring to "well-established Second Circuit precedent holding that, in seeking injunctive relief under a § 10(b) claim, a plaintiff does not have to show damages in connection with the purchase or sale of any security."); *Packer v. Yampol*, 630 F.Supp. 1237, 1241–43 (S.D.N.Y.1986) (same). In *Simon*, the Second Circuit held that the "district court erred insofar as it relied on the fact that [plaintiff] was neither a purchaser nor a seller with respect to the challenged transactions in concluding that appellants' 10b–5 claim was frivolous"; plaintiff had "at least a good faith basis for [plaintiff's] assertion of standing." 186 F.3d at 170–71.

Thus, if the other elements were satisfied, it might be inappropriate to dismiss the manipulation claim here insofar as the remedy sought is injunctive relief. (*See* Compl. ¶ 71). But they are not. Plaintiff's manipulation claim does not survive because Plaintiff has failed adequately to allege actionable misrepresentations or a fraudulent scheme. Defendants' alleged

---

**18.** The standing requirement is distinct from the fourth (i.e. purchase and sale) element of a market manipulation claim. *Compare Blue Chip Stamps*, 421 U.S. at 730–31, 95 S.Ct. 1917 *with U.S. v. Russo*, 74 F.3d 1383, 1391 (2d Cir.1996) (citing *Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)).

**19.** Specifically, Global alleged that the terms of the securities gave the defendants an incentive to drive down the Global stock price:

> Although the defendants represented at the time they acquired the securities that they would not engage in such practices, the defendants engaged in a series of schemes, including short selling, to depress the value of Global common stock and artificially increase trading volume. Defendants are thereby alleged to have abused the conversion rights they acquired to cover short positions, reap improper profits, and receive a disproportionate number of shares at the time of conversion.
>
> *Id.*

and conclusory scheme to "manipulate downward the stock price" (Compl.¶ 68) is insufficient. [20] *See supra* at § III.A.1; *see also Chris–Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 383 (2d Cir.1973) ("The securities laws do not proscribe all buying or selling which tends to raise or lower the price of a security.").

### 3. Insider Trading

Plaintiff alleges that "LOA provided Defendants access to confidential non-public information, relating to their financing options, business plans and contingent liabilities" and that Defendants "engaged in their securities transactions while in possession of LOA's material financial and business information not available to the public." (Compl.¶ 39). Defendants counter that Plaintiff "does not identify in its brief or the Complaint what information, when and to whom and by whom it was provided or that this information was known by the recipient to be non-public." (Def. Reply at 8).

The prohibition against trading on inside information is long standing. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) ("[A]nyone in possession of material inside information ... must either disclose it to the investing public, or, if he is disabled from disclosing it ... or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed."). At the same time, "[t]he failure ... to provide any specific description of the alleged inside information or when it was obtained is grounds in itself for dismiss[al] ... under Fed.R.Civ.P. 9(b)." *See Stromfeld v. Great Atlantic & Pacific Tea Co.*, 496 F.Supp.

1084, 1087 (S.D.N.Y.1980). Plaintiff has failed to provide adequate specifics regarding the circumstances surrounding Defendants' possession of non-public information: e.g., among other things, what non-public information Plaintiff gave Defendants, when the information was given, etc. Plaintiff's insider trading claim is, therefore, inadequate. *See, e.g., In re Ultrafem Inc. Sec. Lit.*, 91 F.Supp.2d 678, 703–04 (S.D.N.Y.2000) (dismissing claim where complaint (only) alleged "this was a sale by an insider possessing material adverse information"); *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 233 (S.D.N.Y.1997) (dismissing claim where the plaintiff does not provide any specifics of an alleged insider trade).

### B. Sections 13(d) and 16(b)

Plaintiff contends that "Defendants individually and/or as a 'group'—because they have the 'right to acquire beneficial ownership ... within sixty days ... through the conversion' of more than 5% and 10%, respectively, of LOA's common stock—violated Sections 13(d) and 16(b) of the 1934 Act." (Pl. Opp. at 21). Defendants argue that: (1) the so-called "blocker" provisions of the Agreement preclude liability under Sections 13(d) and 16(b); (*id.* at 18–19, 20–21); (2) Plaintiff has failed to allege specific facts to support the assertion that the Defendants acted together as a "group" for purposes of Sections 13(d) and 16(b); (Def. Mem at 19–20); and (3) Plaintiff has failed to allege any actual "matching" purchases and sales for purposes of Section 16(b); (*id.* at 21–22).

### 1. Section 13(d)

Section 13(d) of the 1934 Act requires a person who acquires "beneficial ownership" of more than 5% of equity securities

---

20. Similarly, Plaintiff's allegations with respect to "[c]rosses in prearranged transactions," (Compl. ¶ 36; *see also id* at ¶ 68), as currently pled, do not comply with the particularity required of fraud claims under the PLSRA. *See* 15 U.S.C. § 78u4(b)(1)(1997).

of an issuer to file a Schedule 13D within ten days after such acquisition. *See* 15 U.S.C. § 78m(d). "Beneficial ownership" may include the right to acquire securities within sixty days through conversion. *See* 17 C.F.R. § 240.13d–3(d)(1). The parties do not dispute that no Defendant has filed a Schedule 13D; they do dispute whether any of the Defendants had an obligation to make such a filing.

■■■ Defendants' "blocker" argument is compelling. Section 5(a) of the Certificate of Designations expressly limited beneficial ownership by any of the holders to 4.99% of the total outstanding common stock:

> *Limitation on Beneficial Ownership.* The Company shall not effect any conversion of Preferred Shares and no holder of Preferred Shares shall have the right to convert Preferred Shares in excess of that number of Preferred Shares which, upon giving effect to such conversion, would cause the aggregate number of shares of Common Stock beneficially owned by the holder and its affiliates to exceed 4.99% of the total outstanding shares of Common Stock following such conversion.

Certificate of Designations § 5(a).[21] Plaintiff asserts that it is entitled to relief under Section 13(d) because the "conversion cap" does not prohibit *seriatum* conversions of the Preferred Stock into Plaintiff's Common Stock. (Pl. Opp. at 22–24). Specifically, Plaintiff contends that "on day one, [Defendant] Marshall could convert its Preferred Stock into 4.99% of LOA's outstanding common stock and sell it. On day two, it could do the same, and so on." (*Id.* at 22). *Schaffer v. Capital Ventures Int'l,*

98 Civ. 3900(AKH) (S.D.N.Y. Sept. 13, 1999) notwithstanding, the Court finds that the conversion cap in the Certificate of Designations is clearly written and enforceable as a matter of law. *See, e.g., Schaffer v. CC Investments, LDC,* 115 F.Supp.2d 440, 443 (S.D.N.Y.2000) (Marrero, J.) (*"Schaffer I"*) (conversion cap held valid); *Levy v. Marshall Capital Mgmt.,* 99 Civ. 3428 (E.D.N.Y. July 26, 2000) (Amon, J.) (same); *Levy v. Southbrook Int'l Investments, Ltd.,* 99 Civ. 1490, 2000 WL 567008 (S.D.N.Y. May 10, 2000) (Buchwald, J.) (same); *Global Intellicom v. Thomas Kernaghan & Co.,* 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) (Cote, J.) (same). Thus, seriatum conversions are not proscribed by the Agreement or Section 13(d).[22]

■■■ Plaintiff also alleges that Defendants constituted a "group," pursuant to Section 13(d)(3), and, thus, collectively exceeded the 5% limit under Section 13(d)(1). (Compl. ¶¶ 43–45). Defendants contend that "conclusory allegations of fraud and of the Defendants' previous investments in other private placements .... cannot serve as the basis for a claimed violation of Section 13(d)." (Def. Reply at 10). Section 13(d)(3) defines "group" as "two or more persons [who] act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3). A (§ 13(d)(3)) plaintiff must allege "that the defendants acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the [issuer]." *See Schaffer v. CC Investments LDC,* 153 F.Supp.2d 484, 486 (S.D.N.Y.2001) (*"Schaffer II"*); *see also Morales v. Freund,* 163

---

**21.** The Certificate of Designations provides the terms and conditions under which holders of Preferred Stock could convert.

**22.** Similarly, the conversion caps in both the Certificate of Designations and the letter

agreements between several of the Defendants and LOA block individual Defendants from owning 10% of LOA stock. (Def. Mem. at 20–21).

F.3d 763, 767 n. 5 (2d Cir.1999). Plaintiff has not done this. Plaintiff alleges (generally) that:

> Defendants acted together by express or tacit agreement as evidenced by the following facts, among others: (i) Promethean brought Citadel in as an investor because on the day the Securities Purchase Agreement was signed, as Promethean indicated to Plaintiff it did not want on its own to purchase 50% of the Convertible Preferred Stock; (ii) Promethean and Citadel, in the past, have jointly invested in companies, together through the purchase of Convertible Preferred Stock; (iii) Promethean and Citadel in each deal, upon information and belief, as well as in the instant transaction, used the same law firm to represent them; (iv) Marshall and Citadel have jointly invested together in other transactions; and (v) certain of the Defendants, as set forth above, have engaged in similar unlawful and fraudulent conduct in connection with similar transactions with other companies.

(Compl.¶ 77). Plaintiff does not specify how Defendants acted together with a common objective to acquire, hold, vote, or dispose of LOA stock.[23] *See, e.g., Schaffer II,* 153 F.Supp.2d at 486. Nor are there specific allegations of "interrelationships, contracts, alliances, meetings, agreements, coordinated activity, or understandings between or among any of the defendants *regarding the conversion of [LOA] preferred shares ...." See Schaffer I,* 115 F.Supp.2d at 443–44 (emphasis added).

"The unadorned allegation that defendants are acting as a group is not adequate to sustain a Section 13(d) claim." *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972).

### 2. Section 16(b)

■ Section 16(b) provides, in pertinent part, that:

> For the purpose of preventing the unfair use of information which may have been obtained by such [10%] beneficial owner ... any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner ... in entering into such transaction of holding the security ... purchased or of not repurchasing the security ... sold for a period exceeding six months.

*See* 15 U.S.C. § 78p(b). The elements of a Section 16(b) claim are "(1) a purchase and (2) a sale of securities (3) by ... a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 308 (2d Cir.1998).

Plaintiff alleges that "short sales should be considered matching sales for purposes of Rule 16(b) and, where as here, such securities have not yet been converted, the LOA common stock borrowed to cover Defendants' shorts, should be considered matching purchases...." (Compl.¶ 50).[24]

---

**23.** Plaintiff alleges that Defendants: (i) failed to disclose a "pre-existing common scheme" to "jointly sell short LOA's common stock"; (2) engaged in "massive short selling"; and (iii) "engaged in pre-arranged trading and other manipulative practices." (Compl.¶ 32). The allegations are not specific because, among other reasons, Plaintiff fails to identify which individual Defendants joined in the alleged group activity(ies). For example, Plaintiff alleges only that the Promethean and Citadel Defendants engaged in short selling. (*See* Compl. ¶ 33).

**24.** A profit is made when there is a purchase of a security that can be "matched" against a higher priced sale of the security. Section 16(b) requires disgorgement to the company of such profit derived from the matching of a purchase and sale of the "equity security"

Specifically, Plaintiff maintains that "the LOA common stock that Defendants would obtain upon conversion of their Preferred Stock to 'cover' such 'sale' ... is a 'purchase.'" (Pl. Opp. at 24). Defendants contend that even if the Court were to accept Plaintiff's interpretation of "sales" for Section 16(b) analysis, Plaintiff has not (adequately) alleged that any Defendant has made a matching purchase. (Def. Mem. at 21).

■ Plaintiff offers no controlling authority for its position that, for Section 16(b) purposes, sales can be "matched" with "common stock borrowed to cover ... short[ ] [sales]." (Compl.¶ 50).[25] Moreover, there is no allegation in the Complaint that Defendants ever effected any matching purchases. See Global Intellicom, 1999 WL 544708, at *16. The Section 16(b) claim is, therefore, dismissed.

### C. Common Law Fraud

■ To support a claim of fraud where, as here, a contract exists, a plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentations and unrecoverable as contract damages." Bridgestone/Firestone, Inc. v. Recovery Credit Svcs., Inc., 98 F.3d 13, 20 (2d Cir.1996) (internal citations omitted).

■ Plaintiff's (fraud) claim meets none of these requirements. First, no (fiduciary) duty, according to the Agreement,

existed between LOA and Defendants apart from the duty to perform pursuant to the Agreement as reflected in the pleadings.[26] Second, each of the misrepresentations alleged in the Complaint is based upon the Securities Purchase Agreement. (See Compl. ¶¶ 88, 90). Plaintiff's conclusory assertion that "Defendants fail[ed] to disclose information concerning Defendants' true intent," (id. at ¶ 90), without more, does not adequately specify the requisite fraudulent conduct. See Fed.R.Civ.P. 9(b). "We agree with the district court that [Plaintiff] has failed to plead facts sufficient to raise a strong inference of fraud, and that the Complaint therefore must be dismissed for failure to meet the specificity requirements of Rule 9(b)." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994). Plaintiffs' fraud allegations overlap its breach of contract claim; they do not relate to facts collateral and extraneous to the Agreement. See Metropolitan Transp. Auth. v. Triumph Advertising Prods., Inc., 116 A.D.2d 526, 527, 497 N.Y.S.2d 673 (App.Div.1986). Third, Plaintiffs do not seek (plead) special damages as a result of the alleged misrepresentations.

### D. Breach of Contract

LOA asserts that "Defendants are in material breach of the ['Investment Purpose' and 'Restriction on Short Sales'] provisions contained in the Securities Purchase Agreement." (Compl.¶ 98). Defendants counter that: (i) Plaintiff has failed to allege breach; and (ii) Plaintiff has

---

irrespective of intent or whether overall trading during the six months, i.e., all sales and purchases combined, resulted in a loss. See Gwozdzinsky, 156 F.3d at 308; see also supra at 7, n. 10.

25. Plaintiff cites Mouldings, Inc. v. Potter, 465 F.2d 1101 (5th Cir.1972). (Pl. Opp. at 24). However, in Mouldings it was uncontested that Defendant engaged in (short) sales of

stock **and** subsequent repurchases. 465 F.2d at 1103–104.

26. The Agreement states that the Private Placement is an "arm's length" transaction and that "[Plaintiff] ... acknowledges that each Buyer is not acting as a financial advisor or fiduciary of the Company." (Agreement § 3(i)).

failed to allege its own performance. (Def. Mem. at 22–24).

■ To state a breach of contract claim under New York law, a complaint must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 338 (2d Cir.1996). For the reasons already discussed *supra*, the Court finds that Plaintiff has failed sufficiently to plead that Defendants' alleged conduct breached the provision(s) of the Agreement. *See Twinlab Corp. v. Signature Media Svcs., Inc.*, 99 Civ. 169(AGS), 1999 WL 1115237, at *4 (S.D.N.Y. Dec. 7, 1999) (claim dismissed where "conclusory assertion of breach is not supported by the facts alleged....").

### E. Breach of Covenants of Good Faith and Fair Dealing

Plaintiff also alleges that Defendants breached its covenant and duty under the Transaction Documents to deal with Plaintiff fairly and in good faith by "misrepresenting their true intentions in the written terms of the Securities Purchase Agreement and in failing to reveal their true motives to drive down LOA's common stock price." (Compl.¶ 103). Defendants contend that this claim has the same elements of a breach of contract claim, and that both claims should be dismissed. (Def. Mem. at 24).

■ A Plaintiff claiming a breach of the covenant of good faith and fair dealing must show: (1) fraud, (2) malice, (3) bad faith, (4) other intentional wrongdoing, or (5) reckless indifference to the rights of others such as gross negligence. *See T.P.K. Constr. Corp. v. Southern American Ins. Co.*, 752 F.Supp. 105, 112 (S.D.N.Y.1990) (citing *Kalisch–Jarcho,*

*Inc. v. New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 748, 448 N.E.2d 413 (1983)). Plaintiff has not sufficiently pled these requirements for the reasons stated in § III.A, *supra*.

### F. Declaratory Relief and Rescission

Plaintiff seeks declarations under both Section 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b),[27] and the Declaratory Judgment Act, 28 U.S.C. § 2201 that, because of Defendants' alleged fraudulent conduct, Plaintiff is relieved of its obligations and liabilities under the Transaction Documents. (Compl.¶¶ 108, 111–14). "By reason of the fraud, illegality and manipulative conduct ... LOA is entitled to a declaration that ... it is relieved of its obligations and liabilities under the [Transaction Documents] and that the Defendants have no right to have their Convertible Preferred Stock exchanged for LOA common stock." (*Id.* at ¶ 108). Plaintiff also seeks rescission of the Securities Purchase Agreement "by reason of the fraud, illegality and manipulative conduct...." (Compl.¶ 118). Defendants assert that declaratory relief is unwarranted because the claims "are premised upon inadequate allegations of fraud, breach of contract and Sections 13(d) and 16(b) violations." (Def. Mem. at 24) ("Where the underlying claims have been dismissed, dismissal of a claim for declaratory relief is merited."). Defendants also contend that the claim for rescission must be dismissed because Plaintiff has not alleged actionable (securities) fraud. (*Id.*).

■ To establish a violation under Section 29(b) of the 1934 Act, a plaintiff must "show that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in

---

27. Section 29(b) provides in relevant part that "[e]very contract made in violation of any provision of [the 1934 Act] or of any rule or regulation thereunder ... shall be void...." 15 U.S.C. § 78cc(b).

the class of persons the [1934] Act was designed to protect." *Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F.Supp. 1265, 1288 (S.D.N.Y.1992) (quoting *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir.1982)). The Court finds that Plaintiff has not adequately pled these requirements. Specifically, because the underlying claims have been dismissed, Plaintiff has not (sufficiently) alleged that the Agreement involved a "prohibited transaction."

█ The Declaratory Judgment Act has somewhat different requirements than Section 29(b). It provides, in pertinent part, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration...." 28 U.S.C. § 2201(a). The question is whether, upon the facts alleged and, under all the circumstances, there is presented a substantial controversy between parties having adverse legal interests, that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *See Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). "In short, a controversy is justiciable under the Act only if it presents the plaintiff with a present danger or dilemma, and not a danger or dilemma which is contingent upon the happening of certain future or hypothetical events." *Bellefonte Reinsurance Co. v. Aetna Cas. and Sur. Co.*, 590 F.Supp. 187, 191 (S.D.N.Y. 1984). Plaintiff's claim for declaratory relief, as currently plead, does not meet these requirements. (*See* Compl. ¶¶ 110–12, 115). The Court fails to detect in these pleadings "sufficient immediacy and reality" to warrant relief under the Declaratory Judgment Act, for the reasons stated.

Plaintiff's claim for rescission of the Agreement is dismissed as the underlying fraud claims have been dismissed. *See supra* at §§ III.A and III.C.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss [19–1] is granted as to all claims without prejudice.

Plaintiff's application for leave to amend (*see* Pl. Opp. at 25) is granted. Plaintiff may have 14 days from the date hereof to amend (serve and file) Plaintiff's claims in accordance with this Order.

Counsel are directed forthwith to appear at a settlement/scheduling conference with the Court on December 28, 2001, at 11:00 a.m., in Courtroom 706 of the U.S. Courthouse, 40 Centre Street, New York, New York. **The parties are directed to engage in good faith settlement negotiations prior to the conference with the Court.**